## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS.**                    **SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT**

**AMENYOAH BOSSMAN,**

    **Plaintiff,**

    v.                                  **CIVIL ACTION NO. 2184-cv-00285**

**SUFFOLK CONSTRUCTION CO.,**

    **Defendant.**

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Mass. R. Civ. P. 12(b)(6), Defendant Suffolk Construction Company, Inc. (improperly named as Suffolk Construction Co. in Complaint, hereinafter "Suffolk" or "Defendant") hereby moves to dismiss the Complaint filed by Plaintiff Amenyoah Bossman ("Bossman" or "Plaintiff"). As set forth in full in the accompanying Memorandum of Law, Plaintiff's Complain fails to state a claim upon which relief can be granted.

Respectfully submitted,

**SUFFOLK CONSTRUCTION COMPANY, INC.**
By its Attorney,

Kristen Schuler Scammon (BBO# 634586)
TORRES, SCAMMON, HINCKS & DAY, LLP
119 High Street
Boston, MA 02110
T: (617) 307-4426
E: kscammon@tshdlegal.com

Dated: April 5, 2021

## Certification Pursuant to Superior Court Rule 9C

I hereby certify that I conferred by telephone with Plaintiff's counsel Attorney W. Kendall on April 5, 2021 at 1:35 PM and we were unable to narrow areas of disagreement.

_____
Kristen Schuler Scammon

## Certificate of Service

I hereby certify that a copy of the above document was served upon counsel for the Plaintiff by Email and First Class Mail, on this 5th day of April, 2021.

_____
Kristen Schuler Scammon

2

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

AMENYOAH BOSSMAN,

　　　　Plaintiff,

　　　　v.

SUFFOLK CONSTRUCTION CO.,

　　　　Defendant.

CIVIL ACTION NO. 2184-cv-00285

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Pursuant to Mass. R. Civ. P. 12(b)(6), Defendant Suffolk Construction Company, Inc. (improperly named as Suffolk Construction Co. in Complaint, hereinafter "Suffolk" or "Defendant") submits this Memorandum in Support of its Motion to Dismiss the Complaint filed by Plaintiff Amenyoah Bossman ("Bossman" or "Plaintiff").

## BACKGROUND

This matter began at the Massachusetts Commission Against Discrimination (MCAD) in June of 2019. Defendant Moved to Dismiss that charge because Plaintiff failed to file her claim within the required 300 days of the alleged act of discrimination. The MCAD granted Defendant's Motion and dismissed Plaintiff's Complaint for lack of jurisdiction. Plaintiff's appeal of that decision was denied. (Ex. 1).

This is Plaintiff's second complaint filed in this Court. The first complaint was filed in October 2020 after the MCAD dismissal and docketed as Civil Action 20-CV-2284. Because that complaint alleged violations of federal law, Defendant removed the case to the United States District Court for the District of Massachusetts. Plaintiff moved to remand the case to this Court,

and after hearing, the Court (Young, J.) denied the motion to remand and dismissed the federal case with Plaintiff's counsel's assent. (Affidavit of Terrence J. Miglio, Ex. 2). Plaintiff thereafter filed the instant Complaint, which does not include the previously alleged violations of federal law.

The Complaint lacks any specificity in its factual allegations. Plaintiff appears to claim that she was not paid a prevailing wage for her work on public works products, that this failure was discriminatory, that she reported her concerns to her supervisors and that the supervisors failed to investigate those concerns. (Complaint ¶¶8-10). She also alleges that the prevailing wage was required by the Collective Bargaining Agreement ("CBA") between her union and Suffolk, and that said wage included contributions for Plaintiff's pension, sick, medical, and other benefits. (Complaint ¶6). Without detail, she also conclusorily alleges a workplace "contaminated with racial discrimination and humiliation caused and perpetuated by the discriminatory wage, defendant's refusal to contribute to the union package and Wage Act violations." (Complaint ¶13). As a result, Bossman claims she was "forced to involuntarily separate from the employment on or about October 7, 2017." (Complaint ¶15). The Complaint contains no factual allegations supporting Plaintiff's claim of discriminatory treatment, and at base appears to be a claim that she should have been paid prevailing wage but was not.

Bossman now brings claims for 1) Disparate Treatment and Invidious Interference With the Terms and Conditions of Contract of Employment, in violation of Gen. L. c. 151B, §4; 2) Retaliation in violation of Gen. L. c. 151B§4(4) and Gen. L. c. 149 §148; 3) Wage Act Violations; 4) Breach of Contract, and 5) Right of Access to Courts.[1] Because the Complaint fails to state a claim upon which relief can be granted, it should be dismissed in its entirety.

---

[1] Plaintiff's Claims are not set forth as Counts of the Complaint thus this Memorandum is organized by statute and legal theory for ease of reference.

**ARGUMENT**

In considering a motion to dismiss, the allegations of the complaint are to be taken as true, and such inferences that may be drawn from those allegations are to be taken in the plaintiff's favor. *Nader v. Citron,* 372 Mass. 96, 98 (1977). Although a complaint need not set out detailed factual allegations, it must set forth grounds showing a plausible entitlement to relief above the speculative level. *Iannacchino v. Ford Motor Company,* 451 Mass. 623, 636 (2008). Plausible entitlement to relief requires "more than labels and conclusions" and "allegations plausibly suggesting (not merely consistent with) an entitlement to relief. *Iannacchino,* 451 Mass. at 636. And Plaintiff may not assert and rely on legal conclusions cast in the form of factual allegations. *Schaer v. Brandeis Univ.,* 432 Mass. 474, 477 (2000). Given the lack of meaningful detail in the Complaint, any entitlement to relief is wholly speculative. Indeed, much of the Complaint reads as legal conclusions and buzz words strung together without the benefit of any facts about the complained-of conduct by Suffolk or its employees. Because the allegations in the Complaint fail to meet the *Iannacchino* threshold, it must be dismissed for failure to state a claim upon which relief may be granted. Mass. R. Civ. P. 12(b)(6).

## I.   PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE HER CLAIMS ARE PREEMPTED BY THE FEDERAL LABOR MANAGEMENT RELATIONS ACT (LMRA)

Plaintiff's claims for discriminatory treatment in violation of Gen. L. c. 151B, §4, retaliation, violations of the Massachusetts Wage Act and Breach of Contract all boil down to a challenge to Suffolk's alleged failure to pay her the prevailing wage for her work, and failure to contribute to the union for her pension, sick, medical, and other benefits, all in purported violation of her union's CBA with Suffolk. (Complaint ¶6). As alleged, therefore, any assessment of those claims by the Court will require interpretation and application of the CBA. Plaintiff's claims are thus preempted by the Federal Labor Management Relations Act (LMRA), 29 U.S.C. §185(a).

Section 301 of the LMRA preempts a state law claim "where the resolution of the claim depends on the meaning of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988). As the Appeals Court has stated, whether Bossman's action is preempted turns on whether her claim of discrimination asserts a "nonnegotiable State law right independent of the CBA," or whether the claim is "inextricably intertwined" with the agreement. *Butler v. Verizon New England, Inc.*, 68 Mass.App.Ct. 317, 319 (2007). The Complaint specifically alleges that Suffolk's purported violations of the CBA form the basis of Bossman's claim of discrimination. Any court deciding the issue will need to review and apply the CBA, in particular its alleged provisions regarding prevailing wage and contributions to the union for plaintiff's pension, sick, medical, and other fringe benefits. (Complaint ¶6). Thus, unlike the plaintiff in *Butler*, who alleged handicap discrimination resulting from a failure to provide reasonable accommodation separate and distinct from any right conferred by the applicable CBA, Plaintiff here has squarely plead her case as one for violation of the CBA. 68 Mass.App.Ct at 324. Her claims are therefore pre-empted by federal law and must be dismissed.

## II.   PLAINTIFF'S GEN. L. C.151B, §4 CLAIMS SHOULD BE DISMISSED

Plaintiff asserts three types of claims under the Massachusetts Anti-Discrimination Statute, Gen. L. c 151B. She alleges disparate treatment and invidious interference with the terms and conditions of her employment, as well as retaliation by Suffolk. All of her claims are barred by the applicable statute of limitations and should be dismissed on that basis alone. In addition, Bossman utterly fails to demonstrate a right to relief that is more than speculative, and her claims should therefore also be dismissed pursuant to Rule 12(b)(6).

### A. Plaintiff's Gen. L. c. 151B, §4 Claims are Barred by the Statute of Limitations

Claims pursuant to Gen. L. c 151B, §4 must be filed "not later than three years after the alleged unlawful practice occurred." Gen. L. c. 151B, §9. Plaintiff separated herself from employment at Suffolk on October 7, 2017, allegedly due to Suffolk's discrimination and retaliation. (Complaint ¶15). She claims to have protested the alleged discrimination she experienced while still employed at the Company. (Complaint ¶9). She therefore acknowledges that she knew of her claims by October 7, 2017 at the absolute latest.

Plaintiff filed this action on February 8, 2021, more than three years after she ceased her employment at Suffolk. The statute of limitations therefore bars her claims under Gen. L. c. 151B, §4. Any argument by Plaintiff that the date of filing her first Superior Court complaint is the operable date for statute of limitations purposes is misplaced. While that complaint was filed within the applicable statute of limitations (two days before its expiration), after removal to Federal Court at the hearing on Plaintiff's Motion to Remand, Judge Young asked Attorney Kendall if he wanted to stay in federal court. He responded no. (Affidavit of Terrence J. Miglio, Ex. 2 at ¶6). Judge Young also told Attorney Kendall that he would not remand the case to the Superior Court, but instead would dismiss it. Attorney Kendall did not argue against this result. (*Id.* at ¶7). Plaintiff's counsel affirmatively chose dismissal of the federal case, thus terminating the litigation that was filed within with the statute of limitations in favor of filing this litigation that was not. Plaintiff's Chapter 151B claims should therefore be dismissed as time-barred.

**B. Plaintiff's Chapter 151B Claims Alleging Disparate Treatment and Invidious Interference With the Terms and Conditions of Contract of Employment Should Be Dismissed For Failure to State a Claim Upon Which Relief Can be Granted**

To state a claim for employment discrimination under Chapter 151B, §4, a plaintiff must allege "that she is a member of a protected class, she suffered harm as a result of an employer's adverse employment action, and the employer harbored discriminatory animus which was the determinative cause of the adverse action." *Dexter v. Dealogic, LLC*, 390 F.Supp.3d 233, 240 (D. Mass. 2019) (quoting *Weber v. Cmty Teamwork, Inc.*, 434 Mass. 761, 752 N.E.2d 700, 711 (2001)). Plaintiff has not sufficiently alleged these required elements in her Complaint.

First, nowhere in the Complaint does Plaintiff allege that she is a member of a protected class. Suffolk is of course aware that its former employee is an African-American female, but her Complaint nowhere informs the Court of that fact.

Second, while not at all clear from the Complaint, the adverse employment action relied on by Plaintiff appears to be Suffolk's failure to pay her the prevailing wage and contribute to the union benefits package. (Complaint ¶13). But Plaintiff nowhere alleges with the requisite specificity that any discriminatory animus on the part of Suffolk caused that purported failure. The Complaint contains only the conclusory statement that the alleged violations of law were motivated by racial animus, but alleges no facts to support that allegation (nor could it, since Plaintiff's race is nowhere mentioned). All the Complaint does is assert legal conclusions cast in the form of factual allegations. *Schaer*, 432 Mass. at 477, which are insufficient to survive a Motion to Dismiss.

### C. Plaintiff's Retaliation Claim Under Gen L. c. 151B, §4(4) Should Be Dismissed Because it Fails to State a Claim Upon Which Relief Can be Granted

The Complaint also includes a claim that Suffolk retaliated against Plaintiff for exercising her protected rights, including her rights under the Wage Act, in violation of Gen. L. c. 151B§4(4). To succeed on that claim, Plaintiff must allege that she: 1) engaged in protected activity, 2) she suffered some materially adverse action, and 3) the material adverse action was causally linked to the protected activity. *Dixon v. Int'l Bhd. Of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007). Again, while unclear, the protected activity that Plaintiff claims to have engaged in appears to be her complaints to unnamed "supervisory officials" about the Company's failure to pay her a prevailing wage. (Complaint ¶9). Failure to pay the prevailing wage cannot therefore also serve as the materially adverse action allegedly taken against Plaintiff in retaliation for her complaint.

The only arguable adverse action alleged in the Complaint is the purported constructive discharge of Plaintiff after she suffered "retaliatory animus" that interfered with the terms and conditions of her employment, causing her to leave the Company. (Complaint ¶¶14, 15). The paucity of detail in the Complaint about the precise animus she experienced that led to her alleged constructive discharge compels the conclusion that she has not adequately plead this claim. To adequately plead constructive discharge, Bossman must allege "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Votolato v. Verizon New England, Inc.*, 2018 WL 4696743, *9 (D. Mass. Oct. 1, 2018) (Ex. 3). Dissatisfaction with compensation is insufficient to establish intolerable working conditions and constructive discharge. *Vonachen v. Computer Associates Intern., Inc.*, 524 F.Supp.2d 129, 138 (D. Mass. 2007).

The only working condition Plaintiff complains of with any specificity is the alleged failure to pay her a prevailing wage and union benefits. She therefore fails to adequately plead

constructive discharge, or any other materially adverse action, taken against her in retaliation for her complaints about that prevailing wage issue. Her Chapter 151B, §4(4) retaliation claim should therefore be dismissed.

### III.   PLAINTIFF'S WAGE ACT CLAIMS SHOULD BE DISMISSED

Plaintiff brings two claims under the Wage Act; one for failure to pay wages, and one for retaliation. Both claims must be dismissed since Bossman fails to allege that she filed a complaint with the Massachusetts Attorney General, a pre-requisite to a private civil suit based on the Wage Act, and because the claims have not been filed within the applicable statute of limitations. Further, since Plaintiff's complaint about her wages is based on Suffolk's alleged failure to pay her a prevailing wage, she may not bring a claim under the Wage Act for that conduct. Finally, because she fails to adequately plead a constructive discharge, her retaliation claim under the Wage Act also fails to state claim upon which relief can be granted.

### A.   Plaintiff's Wage Act Claims Should Be Dismissed Because She Failed to File a Complaint with the Massachusetts Attorney General

An employee's private right of action under the Wage Act is conditioned on the filing of a complaint with the Attorney General of Massachusetts.  Gen. L. c. 149, §150; *Norceide v. Cambridge Health Alliance*, 814 F.Supp.2d 17, 27 (D. Mass. 2011).  Bossman does not allege that she filed such a complaint and attaches no evidence of such filing or of a right to sue letter from the Attorney General.  While she does allege that "all conditions precedent to the commencement of this action have occurred and have been fulfilled," (Complaint ¶19) merely alleging that legal conclusion does not make it so.  Absent a representation that Plaintiff has complied with the statutory pre-requisite for filing a Wage Act claim, that claim should be dismissed.

8

### B. Plaintiff's Wage Act Claims are Barred by the Statute of Limitations

Like Chapter 151B, the Massachusetts Wage Act contains a three-year statute of limitations requiring that a Complaint be filed no later than three years after the violation of the Act. Gen. L. c. 149, §150. Plaintiff separated herself from employment at Suffolk on October 7, 2017, allegedly due to Suffolk's discrimination and retaliation in the form of underpaid wages (Complaint ¶15). She claims to have protested the alleged violations of the Wage Act while she was still at the Company. (Complaint ¶9). She therefore acknowledges that she knew of her claims by October 7, 2017 at the absolute latest.

Plaintiff filed this action on February 8, 2021, more than three years after she ceased her employment at Suffolk. For the reasons stated in Section II(A) above, the date of Plaintiff's first complaint in this Court is not the operative date for statute of limitations purposes. Her Complaint should therefore be dismissed.

### C. Plaintiff's Wage Act Claim Should Be Dismissed Because She Cannot Recover Under the Wage Act for Alleged Failure to Pay Prevailing Wage

While she makes passing reference to "discriminatory wages," without explaining how her wages differed from other similarly situated Suffolk employees, Plaintiff appears to base her Wage Act claim on the Company's alleged failure to pay her the prevailing wage for her work on public projects. Plaintiff's claim must be dismissed because the Supreme Judicial Court has made clear that a plaintiff may not recover under the Wage Act for a violation of the Prevailing Wage Act. *Donis v. American Waste Svcs., LLC*, 485 Mass. 257, 258 (2020).

As the Court stated in *Donis*, "[t]he purpose of the Wage Act is to prevent the unreasonable detention of wages" while the Prevailing Wage Act "governs the setting and payment of wages on public works projects." *Donis*, 485 Mass. at 263. Given these different purposes, and the availability of a private right of action under the Prevailing Wage Act, the SJC concluded that the

legislature did not intend for violations of the Prevailing Wage Act to be remedied under the Wage Act. *Id.* at 368-69. Bossman does not allege any delay or failure to pay her wages; she simply alleges that Suffolk should have, but did not, pay her a prevailing wage. That claim is properly brought only under the Prevailing Wage Act, not the Wage Act, thus her Wage Act claim should be dismissed.

### D. Bossman's Wage Act Retaliation Claim Should be Dismissed Because She Fails to Adequately Plead a Constructive Discharge

Plaintiff also alleges that Suffolk retaliated against her in violation of the Massachusetts Wage Act, Gen. L. c. 149, §148. While unclear, it appears that Plaintiff bases her retaliation claim on the allegation that she was constructively discharged from her employment as a result of her complaints about Suffolk's purported failure to pay her a prevailing wage. In these circumstances, Plaintiff is required to allege and prove constructive discharge. *Vonachen*, 524 F.Supp.2d at 136-37. For the reasons stated in Section II(C) above, Plaintiff has failed to plead any facts sufficient to present a cognizable claim for constructive discharge. Her Wage Act retaliation claim should therefore be dismissed.

### IV.   PLAINTIFF'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED

Plaintiff's breach of contract claim should be dismissed because she does not sufficiently allege the existence of an individual employment contract between her and Suffolk.

First, Plaintiff alleges that she was covered by Suffolk's CBA with the Carpenters Union of which she was a member. (Complaint ¶¶4-6). As discussed in Section I, above, her breach of contract claim is thus preempted by the LMRA. Bossman identifies no other contract between her and Suffolk and cannot identify such a contract because a party to a CBA cannot also have an individual employment contract.

Second, Plaintiff specifically pleads that her employment at the Company was "at will." (Complaint ¶3).[2]  At-will employees like Plaintiff can be "terminated at any time for any reason or for no reason at all" unless the "at-will employee is terminated for a reason that violates a clearly-established public policy." *Upton v. JWP Businessland*, 425 Mass. 756, 757 (1997).  At-will employees therefore generally cannot succeed on breach of contract claims, subject to narrow exceptions for violation of public policy or to prevent unjust enrichment of the employer. *Beaupre v. Seacoast Sales, Inc.*, -- F.Supp.3d --, 2020 WL 7386311, *5 (D. Mass. Dec. 16, 2020) (Ex. 4). The public policy exception is limited to situations where an at-will employee is terminated for "asserting a legally guaranteed right (*e.g.*, filing workers compensation claim), for doing what the law requires (*e.g.*, serving on a jury), or for refusing to do that which the law forbids (*e.g.* committing perjury)." *Merricks v. Savers, Inc.*, 2012 WL 32579, *6 (D. Mass. Jan. 6, 2012) (quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mas. 145, 149-50 (1989)) (Ex. 5). The exception for unjust enrichment is limited to cases where an employer fires an employee in order to deprive the employee of earned compensation.  *Beaupre*, 2020 WL 7386311 at *6.

Plaintiff was not terminated by Suffolk.  While the Complaint alleges that she "involuntarily separate[d]" from the Company as a result of her alleged treatment, as discussed above, she does not include any facts supporting a claim for constructive discharge.  The Complaint contains no allegations that qualify Plaintiff for treatment as an exception to the rule. Her breach of contract claim is thus wholly speculative and should be dismissed.

---

[2] Plaintiff attempts to allege that the provisions of Executive Order 526 issued in 2011 by former Governor Patrick somehow formed the terms and conditions of her "contract" of employment.  While it is unclear exactly what in the Executive Order Plaintiff believes applied to her employment with Suffolk, the Order clearly does not apply to Plaintiff or Suffolk since it only applies to "state agencies in the Executive Branch." *Cross v. Commonwealth of Mass.*, 2019 WL 1936735, *4 (D. Mass. May 1, 2019) (Ex. 6).

## V. PLAINTIFF'S CLAIM ALLEGING VIOLATIONS OF PLAINTIFF'S RIGHT OF ACCESS TO COURTS SHOULD BE DISMISSED

Plaintiff's final claim alleging violations by Suffolk of her right of access to courts is perplexing since her case has been litigated at the MCAD, once in this Court, in the United States District Court, and now back at this Court. It is therefore unclear how she has been denied access to the courts.

Cases alleging denial of a right of access to the courts typically arise in the context of prison inmates who allege that their constitutional right of access to the courts is infringed by a prison's regulations or practices. Those cases require that the plaintiff suffer an actual injury, such as a claim that cannot be presented or that is lost or rejected, because of the purported denial of access. *Jiles v. Department of Correction*, 55 Mass.App.Ct. 658, 661-62 (2002). Because the very existence of this lawsuit demonstrates that Plaintiff suffered no actual injury, her claim alleging violation of her right of access to the courts should be dismissed.

## CONCLUSION

For the reasons stated herein, Plaintiff's Complaint should be dismissed in its entirety because it fails to state any claim upon which relief can be granted.

Respectfully submitted,

**SUFFOLK CONSTRUCTION COMPANY, INC.**
By its Attorney,

Kristen Schuler Scammon (BBO# 634586)
TORRES, SCAMMON, HINCKS & DAY, LLP
119 High Street
Boston, MA 02110
T: (617) 307-4426
E: kscammon@tshdlegal.com

Dated:  April 5, 2021

### Certificate of Service

I hereby certify that a copy of the above document was served upon counsel for the Plaintiff by Email and First Class Mail, on this 5th day of April, 2021.

Kristen Schuler Scammon

# EXHIBIT 1

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108
Phone: (617) 994-6000   Fax: (617) 994-6024

August 26, 2020

ISSUED BY EMAIL

Richard W Kendall
Law Office of W. Kendall
136 Warren St.
Boston, MA 02119
Invictusille@live.com

**RE: Amenyonah Bossman v. Suffolk Construction Co.**
**MCAD Docket Number: 19BEM02168**
**EEOC Federal Charge Number: 16C-2019-02205**

**DISMISSAL AFFIRMED**

Dear Parties/Counsel:

On July 13, 2020, a preliminary hearing was held regarding the above referenced complaint to consider the Complainant's appeal of the Commission's decision to dismiss the complaint in whole or in part on February 27, 2020.

Based upon information presented at the appeal hearing and a review of the evidence adduced in the investigation, I hereby affirm the dismissal of the complaint in its entirety pursuant to 804 CMR 1.08(4)(b)(6) (2020). Further administrative or judicial review is unavailable pursuant to 804 CMR 1.08(4)(b)(3) (2020).

Sincerely,

*Neldy Jean-Francois*

_____
Neldy Jean-Francois
Investigating Commissioner

cc:  Terrence J Miglio J Miglio, Esq.
     Varnum LLP
     160 West Fort Street, Fifth Floor
     Detroit, MI 48226
     tjmiglio@varnumlaw.com

     Amenyonah Bossman
     14 Stonecrest Rd.
     Mattapan, MA 02126
     (No Email Address)

# EXHIBIT 2

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, SS.**                                                  **SUPERIOR COURT DEPARTMENT**
                                                                 **OF THE TRIAL COURT**

|                                        |                                        |
| -------------------------------------- | -------------------------------------- |
| **AMENYOAH BOSSMAN,**                  |                                        |
|     **Plaintiff,** | **CIVIL ACTION NO. 2184-cv-00285**     |
|     **v.**         |                                        |
| **SUFFOLK CONSTRUCTION CO.,**          |                                        |
|     **Defendant.** |                                        |

**<u>AFFIDAVIT OF TERRENCE J. MIGLIO</u>**

I, Terrence J. Miglio, Esq., being duly sworn, hereby deposes and states:

1. I am an attorney and a shareholder in the law firm Butzel Long, and practice in the firm's office in Ann Arbor, Michigan.

2. I was *pro hac vice* counsel of record to Defendant Suffolk Construction Company, Inc. ("Suffolk") in litigation in the United States District Court for the District of Massachusetts captioned *Bossman v. Suffolk Construction Company, Inc.*, Civil Action NO. 20-CV-12065-WGY (the "Federal Litigation").

3. The Federal Litigation resulted from the removal of a prior action filed by Plaintiff against Suffolk in the Superior Court of Massachusetts for Suffolk County.

4. After removal by Suffolk, Plaintiff filed a Motion to Remand in the Federal Litigation, which Suffolk opposed.

5. On February 3, 2021, Judge Young of the United States District Court held a hearing on Plaintiff's Motion to Remand.  I attended that hearing on behalf of Suffolk, and Plaintiff's counsel Attorney Winston Kendall attended on her behalf.

6. During the hearing, Judge Young indicated that the case had been properly removed because Plaintiff's asked Attorney Kendall if he wanted to stay in federal court. He responded no.

7. Judge Young also told Attorney Kendall that he would not remand the case to the Superior Court, but would dismiss it.  Attorney Kendall did not argue against this result.

Signed under the pains and penalties of perjury this second day of April, 2021.

_____

Terrence J. Miglio, Esq.

# EXHIBIT 3

2018 WL 4696743
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Dacia VOTOLATO, Plaintiff,
v.
VERIZON NEW ENGLAND, INC.,
Defendant.

CIVIL ACTION NO. 16-cv-11663-DPW
|
Signed 10/01/2018

**Attorneys and Law Firms**

Sonja L. Deyoe, Law Offices of Sonja L. Deyoe,
Providence, RI, for Plaintiff.

Robert George Young, II, Timothy P. Van Dyck,
Bowditch & Dewey, LLP, Framingham, MA, Timothy H.
Powell, The Bennett Law Firm, Portland, ME, for
Defendant.

MEMORANDUM

DOUGLAS P. WOODLOCK, UNITED STATES
DISTRICT JUDGE

**\*1** Defendant Verizon New England, Inc. seeks summary
judgment against claims by Plaintiff Dacia Votolato that
Verizon is responsible for a retaliatory hostile work
environment, orchestrated her constructive discharge, and
engaged in deceit and negligent misrepresentation
regarding long-term disability benefits available to her. I
have granted the motion as to the retaliatory hostile work
environment and constructive discharge claims. But
because genuine issues of material fact remain regarding
the claims sounding in misrepresentation, I have denied
Verizon's motion regarding misrepresentation of
available benefits. This Memorandum provides a detailed
explanation for those decisions.

## I. BACKGROUND

### A. Factual Background

I summarize the facts in the light most favorable to Ms.
Votolato as the party opposing summary judgment. *See
Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323 (1st
Cir. 1996). Notably, Ms. Votolato has not filed a response
to the facts set forth in Verizon's Rule 56.1 statement of
undisputed material facts. Rather, while providing her
own "statement of material facts of record," she cites to
Verizon's facts throughout her opposition. Accordingly,
uncontroverted facts of record supplied by Verizon are
deemed admitted. *See* Local Rule 56.1.

#### 1. The Parties

Plaintiff Dacia Votolato began working for Defendant
Verizon New England, Inc. in 1996 and she was assigned
to an office in Providence, Rhode Island. She was
employed as a telephone operator and was a member of
the union. In approximately 2004, Ms. Votolato
transitioned from an office in Providence to an office in
Fall River, Massachusetts, where she remained through
the rest of her employment. At all times relevant to this
matter, Ms. Votolato was supervised by Kellie Machado
and Sara Mendes, two first-level managers, who in turn
reported to Cindy Malone, a second-level manager.

#### 2. The Larry Lastra Sexual Harassment Incident

In January 2015, Ms. Votolato reported to Ms. Mendes
concerns that a coworker and fellow union member, Larry
Lastra, had engaged in behavior in December 2014 that
could constitute sexual harassment. Ms. Votolato admits
that she did not want to report Mr. Lastra's behavior, but
rather claims that Ms. Mendes "made" her provide details
about Mr. Lastra's behavior once she indicated that Mr.
Lastra had acted inappropriately. In her own words, Ms.
Votolato felt like a "traitor" to Mr. Lastra, describing
"snitch[ing] on someone [in the union]" as a "very uncool
thing to do." In any event, Ms. Votolato acknowledges
that Verizon took her concerns seriously. Mr. Lastra was
suspended promptly and Verizon's Security Department

Votolato v. Verizon New England, Inc., Not Reported in Fed. Supp. (2018)

launched an investigation into his behavior. As a result of that investigation, Verizon terminated Mr. Lastra's employment.

3. The Alleged Retaliatory Acts

Beginning in the end of March 2015, Ms. Votolato contends that her coworkers subjected her to a hostile work environment because of her complaint about Mr. Lastra. Ms. Votolato was out of the office on a leave of absence from January through March and acknowledges that no act of purported retaliation occurred during that time.

**\*2** In the aftermath of reporting her concerns about Mr. Lastra's behavior, Ms. Votolato texted frequently with her direct supervisor, Ms. Machado. She expressed concerns about her fellow union members' retaliating against her because of her complaint. Ms. Machado responded compassionately to these messages, both through text messages to Ms. Votolato and in telephone and in-person conversations. Ms. Machado repeatedly assured Ms. Votolato that there was value in what she reported and Ms. Machado further offered to help her in any way she might think she needed.

Ms. Votolato claims that her complaint against Mr. Lastra was almost like "Public Knowledge." In particular, she maintains that Ms. Machado reported in front of two employees at the Fall River Verizon office that Ms. Votolato contended Mr. Lastra had exposed himself and that he had shown a picture of a penis on a keyboard to Ms. Votolato.

According to Ms. Votolato, after the incident with Mr. Lastra, her coworkers "just gave [her] the cold shoulder." Furthermore, she claims that several of her coworkers "unfriended" her on Facebook and that Mr. Lastra posted comments on Facebook which she found upsetting, though she acknowledges that Verizon does not have control over what people post on their personal Facebook pages.

Additionally, Ms. Votolato contends that coworkers who were assigned to the "in charge" desk were not addressing her concerns as quickly as they had in the past, however she concedes that she has no evidence that her job was impacted adversely by this circumstance. Employees assigned to the "in charge" desk monitor the workflow in the office and ensure that the employees take their breaks as required under the union contract. The employees assigned to the "in charge" desk, however, are union

members who do not participate in hiring, firing, disciplining, or evaluating employees; only Verizon management, none of which are assigned to the "in charge" desk, conducts those functions. Simply put, the "in charge" desk employees are peers to the other union members in the office.

Ms. Votolato further alleges that she was subjected to "numerous little slights." For example, Ms. Votolato maintains that other employees would give her "dirty" or even "menacing" looks. She states one coworker "let the door slam in [her] face" when she was entering the Fall River facility behind the coworker one day. Moreover, Ms. Votolato claims that one of her coworkers tried to run her over with a car in the parking lot, but she concedes that this allegation is based solely on her observation that the employee was driving fast in the parking lot and on her "vibe" that the coworker did not like her. Nevertheless, Ms. Votolato reported this incident to Ms. Machado, who, according to Ms. Votolato, "blew it off as [the coworker's] normal driving." Ms. Votolato, however, maintains that she had seen the same coworker leave the parking lot before and she did not drive that quickly. Meanwhile, Ms. Votolato reported lights being out in the parking lot, and Ms. Machado told her they would be fixed immediately but they were not. She then went to Elaine Coulombe, a service assistance supervisor, who got the lights fixed as it related to her safety.

Ms. Votolato further claims that on one occasion, a coworker stated, "Oh, someone call security," when she entered the lunchroom. Additionally, she alleges that one of her coworkers called her "sneaky" on one occasion. On another occasion, when a coworker hugged her someone said, "Oh, you're [sic] hugging her?" A friend advised her via text regarding the atmosphere at work: "[T]ry to control yourself and keep your cool because they want to make you look crazy and get Larry his job back."

**\*3** Ms. Machado made a point to be present when Ms. Votolato was gathering with other union employees, to make sure no one was treating her poorly. This strategy was recommended to Ms. Machado by Verizon's Human Resources department in response to the text messages that Ms. Votolato had sent Ms. Machado. Ms. Machado, however, did not witness any improper conduct toward Ms. Votolato from her fellow union members. In any event, Ms. Machado asked Ms. Votolato to provide her with the names of the individuals she was referring to and examples of the behavior she was concerned about, but Ms. Votolato refused to provide Ms. Machado with any details.

Ms. Votolato generally considered Ms. Machado to be

supportive of her, nevertheless believing that Ms. Machado contributed to the alleged hostile work environment when she purportedly tried to "fluff" off her accusation that a coworker had tried to run her over in the parking lot.

#### 4. The Facebook Post

In April 2015, while Ms. Votolato was on a leave of absence from Verizon, she wrote a Facebook post that came to the attention of her employer. The message said something like, "To all the Larry sympathizers: Did it ever occur to you he might have hurt someone? There are two sides to every story. Would it make you feel better if I blow my brains out? You got it."

In response, Cindy Malone contacted Ms. Votolato directly and encouraged her to seek assistance from Verizon's Employee Assistance Program ("EAP"). After speaking with Ms. Votolato, Ms. Malone reached out to the EAP for assistance. Ms. Malone provided the EAP representative with Ms. Votolato's phone number and asked if she would call Ms. Votolato. Because the EAP representative could not reach Ms. Votolato, Ms. Malone contacted the local police to perform a wellness check, which confirmed that Ms. Votolato was safe.

Ms. Votolato says Verizon suspended her for two weeks in June 2015 allegedly because she lacked sufficient available FMLA leave.

#### 5. The Christopher Williams Retaliation Incident

In approximately July 2015, Christopher Williams, a fellow union member, reported to the union business manager, Rita Sweeny, who is not a Verizon employee, that Ms. Votolato had shown him a cell phone video of a naked man in a hot tub. According to Ms. Votolato, Ms. Sweeny then called her and yelled at her regarding the incident. Ms. Sweeny specifically said, "Because of you we have someone out on the street.... You went running to management. We're like a family. We have our way of working things out." When Ms. Votolato went to Mr. Williams to ask why he had reported the matter to Ms. Sweeny, Mr. Williams allegedly responded, "Really? After what you did to Larry, you deserve this."

Upset by this remark, Ms. Votolato reported it to Ms. Mendes. Ms. Mendes allowed Ms. Votolato to leave work

for the rest of the day and immediately spoke with Mr. Williams to remind him about Verizon's anti-retaliation policy. Ms. Malone also spoke with Mr. Williams regarding the incident. Ultimately, Mr. Williams, conceding that there was nothing of a sexual nature in the bathtub video, did not file an internal complaint with Verizon, Ms. Votolato faced no disciplinary action as a result of the incident, and she acknowledges that Verizon did the right thing in response to her concerns about Mr. Williams.

Ms. Votolato states that following the incident with Mr. Williams, she was placed on a six-month job-in-jeopardy status for missing time out of work without adequate FMLA hours.

#### 6. Ms. Votolato's Reporting of Retaliation

Although Verizon's Code of Conduct expressly forbids retaliation for initiating internal complaints, Ms. Votolato never raised concerns about anything approaching express retaliation, other than reporting the incident with Mr. Williams to Ms. Mendes. She concedes that she did not report any of the allegedly "subtle harassment" to management at Verizon.

#### 7. Ms. Votolato's Leave of Absence and Disability Benefits

**\*4** Ms. Votolato acknowledges that no acts of purported retaliation occurred at any time after August 15, 2015. She ultimately went out on a leave of absence as of September 21, 2015. Ms. Votolato received short-term disability benefits under Verizon's Sickness Disability Benefits Plan during this absence. However, her short-term disability benefits were set to expire on July 9, 2016.

In anticipation of Ms. Votolato's reaching the maximum benefit period allowed under the terms of the Sickness Disability Benefits Plan, Ms. Malone sent Ms. Votolato a letter on June 3, 2016, describing her options upon exhaustion of her Sickness Benefits. Ms. Malone informed Ms. Votolato that these options were (1) to request a further leave of absence; (2) to request a workplace arrangement or accommodation that would facilitate her return to work (for which the required paperwork was attached); or (3) to return to work. The letter stated that unless Ms. Votolato acted on the letter by

returning to work or pursuing another option, she "[might] face possible termination by Verizon effective 7/9/2016." Ms. Votolato did not respond to this letter. Verizon, nevertheless, did not terminate Ms. Votolato's employment immediately after her Sickness Disability benefits expired.

Instead, Ms. Malone sent Ms. Votolato a second letter on July 12, 2016, to inquire about her status. In that letter, Ms. Malone advised Ms. Votolato that she could apply for long-term disability benefits. A prior long-term disability claim had been closed because Ms. Votolato failed to submit the required information to MetLife. Ms. Malone also offered Ms. Votolato the opportunity to return to work and again offered to discuss any workplace arrangement or accommodation that could help Ms. Votolato return. In response to this letter, Ms. Votolato did not contact Ms. Malone but rather pursued long-term disability benefits from MetLife.

MetLife administers Verizon's short-term and long-term disability benefits plans. It is MetLife, not Verizon that determines whether an employee is eligible for either short-term or long-term disability benefits based on a medical condition. Eventually, Ms. Votolato submitted a formal application for long-term disability benefits.

While Ms. Votolato's application for long-term disability benefits was pending, Kathryn Schindelar, a member of Verizon's Workplace Accommodations Team, reached out to Ms. Votolato to discuss her return to work status. In a letter dated July 22, 2016, Ms. Schindelar advised Ms. Votolato that if she were to accept long-term disability benefits approved by MetLife, she would need to separate from Verizon's payroll because that is what the Long-Term Disability Benefits Plan requires. Alternatively, Ms. Schindelar offered to discuss potential "workplace arrangements" that would allow Ms. Votolato to return to work.

Ms. Schindelar followed her letter with a phone call with Ms. Votolato. According to Ms. Votolato, Ms. Schindelar stated that Ms. Votolato was "going to get approved" for long-term disability benefits from MetLife. Ms. Votolato specifically testified that Ms. Schindelar spoke "so authoritatively" that it seemed "she was the final word" and "there was unequivocally no doubt in either of our mind[s] that this was approved." Ms. Votolato's psychologist, Dr. William Hancur, who was on the call as well, also recalled an apparently definitive statement from Ms. Schindelar. Dr. Hancur recalled that during that same call Ms. Schindelar told him "that Ms. Votolato had been granted long-term disability by MetLife and that we would – that she could then – we could then go forward

with that, you know, with that understanding."

**\*5** Ms. Votolato resigned her employment with Verizon as of July 2016. Shortly thereafter, however, Ms. Votolato learned that MetLife had denied her application for long-term disability benefits. Despite this denial, Ms. Votolato made no effort to return to work at Verizon. Regardless of the status of her long-term disability benefits application, Ms. Votolato described herself, as of July 2016, as a "mess" who "probably would not have been able to return to work." In fact, she admits that she "never pursued" a return to work at Verizon after her short-term disability benefits had expired in early July 2016.

### *B. Procedural Background*

On June 6, 2016, Ms. Votolato filed this action in the Suffolk Superior Court seeking redress for claims of: sexual discrimination and sexual harassment in violation of Mass. Gen. Laws ch. **151B**, §§ 4(1) and (16A) and Title VII of the Federal Civil Rights Act, hostile work environment in **retaliation** in violation of Mass. Gen. Laws ch. **151B**, § 4 and Title VII; aiding and abetting discrimination in violation of Mass. Gen. Laws ch. **151B**, §§ 4(4A) and 4(5); and termination and **constructive discharge** in violation of Mass. Gen. Laws ch. **151B** and Title VII.

Verizon filed a Notice of Removal, resulting in the transfer of the case to this Court on August 16, 2016. On August 23, 2016, Verizon filed a Partial Motion to Dismiss for failure to state a claim on the sexual harassment and sexual discrimination and aiding and abetting discrimination counts.

On September 12, 2016, Ms. Votolato filed an amended complaint, which included claims from her initial complaint: hostile work environment and **retaliation** in violation of Mass. Gen. Laws ch. **151B**, § 4 and Title VII; termination and **constructive discharge** in violation of Mass. Gen. Laws ch. **151B** and Title VII; and for the first time, fraud based on deceit and negligent misrepresentation regarding benefits. Verizon answered the amended complaint on September 26, 2016. As a consequence, I issued an order finding Verizon's earlier motion to dismiss the original complaint moot and the parties proceeded to discovery, at the conclusion of which Verizon filed the motion for summary judgment now before me.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (quoting Fed. R. Civ. P. 56(c) ). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Id.* A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, ... would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted).

Therefore, to succeed on a summary judgment motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). In order to preclude summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal quotations and citations omitted).

## III. ANALYSIS

### A. Retaliatory Hostile Work Environment Claim
**\*6** It is well-established that "[b]oth Title VII and chapter 151B contain provisions that make it unlawful for employers to retaliate against persons who complain about unlawfully discriminatory employment practices." *Noviello v. City of Bos.*, 398 F.3d 76, 88 (1st Cir. 2005). In order to establish a claim for retaliation under either statute, "a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." *Id.* (citing *Dressler v. Daniel*, 315 F.3d 75, 78 (1st Cir. 2003) (Title VII); *Sullivan v. Raytheon Co.*, 262 F.3d 41, 48 (1st Cir. 2001) (chapter 151B) ).

The First Circuit has held that "workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." *Noviello*, 398 F.3d at 89. The *Noviello* court further held that "under Massachusetts law as under Title VII, subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action." *Id.* at 91. This holding was followed by a similar holding in *Clifton v. Mass. Bay Transp. Auth.*, 445 Mass. 611, 839 N.E.2d 314, 318 (Mass. 2005). The Massachusetts Supreme Judicial Court there noted that "[a]lthough unlawful retaliation, typically, may involve a discrete and identifiable adverse employment decision (e.g., a discharge or demotion), it may also consist of a continuing pattern of behavior that is, by its insidious nature, linked to the very acts that make up a claim of hostile work environment." *Id.* (citing *Noviello*, 398 F.3d at 89–91). Thus, a plaintiff may recover on a retaliatory hostile work environment claim when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Noviello*, 398 F.3d at 84 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ).

Here, there is no dispute that Ms. Votolato engaged in protected activity by reporting her concerns about Mr. Lastra, Verizon concedes this much. [Dkt. No. 29 at 10]. The parties instead dispute whether the second and third elements of a retaliation claim are satisfied.

#### 1. Disputed Retaliation Claim
Ms. Votolato relies upon a series of incidents that she contends amount to a hostile work environment. Nevertheless, before it can be actionable, "[a]n allegedly retaliatory act must rise to some level of substantiality...." *Noviello*, 398 F.3d at 92. As a result, Ms. Votolato "must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." *Id.*

Moreover, the harassing environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Noviello*, 398 F.3d at 92 (quoting *Faragher*, 524 U.S. at 787-88, 118 S.Ct. 2275); *see also Alvarado v. Donahoe*, 687 F.3d 453, 458-59 (1st Cir. 2012) ("That a series of minor retaliatory actions may, when *considered in the aggregate*, satisfy the *McDonnell Douglas* prima facie 'adverse action' requirement, is settled law in this Circuit.") (emphasis added).

**\*7** The First Circuit has noted that "if protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not be deterred from such activity ... [because] an employee reasonably can expect to encounter such tribulations even if she eschews any involvement in protected activity." *Noviello*, 398 F.3d at 92. Rather, "[t]he very act of filing a charge against a coworker will invariably cause tension and result in a less agreeable workplace." *Id.* at 93. As a result, "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Id.* at 92; *see also Alvarado*, 687 F.3d at 461 (quoting *Gómez–Pérez* v. *Potter*, 452 F. App'x. 3, 9 (1st Cir. 2011) ) ("a string of trivial annoyances will not suffice to make an adverse action showing: 'the alleged harassment must be severe or pervasive' ") (internal quotations omitted). Nevertheless, "severe or pervasive harassment in retaliation for engaging in protected activity" is unacceptable under Title VII and chapter 151B. *Noviello*, 398 F.3d at 92.

The First Circuit's *Noviello* decision is instructive on how such an analysis should proceed. First, the *Noviello* court identified conduct that could not be considered as contributing to a retaliatory hostile work environment, that is, "those actions that are hurtful to a complainant only because coworkers do not take her side in a work-related dispute." *Noviello*, 398 F.3d at 93. It then identified conduct that could properly be considered in the analysis: "those actions, directed at a complainant, that stem from a retaliatory animus." *Id.*

The *Noviello* court ultimately concluded that the evidence in the case "would permit–although certainly not compel–a reasonable jury to find that the plaintiff was subjected to a retaliation-based hostile work environment." *Noviello*, 398 F.3d at 93. In reaching its conclusion, the *Noviello* court took "into account the relative ubiquity of the retaliatory conduct, its severity, its natural tendency to humiliate (and, on occasion, physically threaten) a reasonable person, and its capacity to interfere with the plaintiff's work performance." *Id.* That level of severe or pervasive harassment is not

present in the record before me here. This case is one which falls below the heightened "severe or pervasive" threshold. The very act of Ms. Votolato's report against Mr. Lastra invariably caused tension and resulted in a less agreeable workplace, nothing more.

For example, although Ms. Votolato was falsely accused of misconduct like the plaintiff in *Noviello, see Noviello*, 398 F.3d at 93, no formal complaint was filed with Verizon and Ms. Votolato did not face any disciplinary action as a result of the incident. Rather, Ms. Mendes immediately spoke with Mr. Williams to remind him about Verizon's anti-retaliation policy. Ms. Malone, Ms. Votolato's second-level manager, also got involved and spoke with Mr. Williams regarding the incident. Ms. Votolato even acknowledges that Verizon did the right thing in response to her concerns about Mr. Williams. Additionally, although "work sabotage, exclusion, [and] denial of support" may contribute to the creation of a hostile work environment, *see Noviello*, 398 F.3d at 93, Ms. Votolato's allegation that coworkers who were assigned to the "in charge" desk were not addressing her concerns as quickly as they had in the past, is unavailing as she concedes that she has no evidence that her job was impacted adversely.

Furthermore, in *Noviello*, one of the plaintiff's coworkers, who continuously tormented the plaintiff, also "placed the plaintiff at risk of physical harm by coming close to striking her with a van." *Noviello*, 398 F.3d at 94. The court noted that "if that was intentional[,] ... it [wa]s a cogent indicator of an adverse change in the conditions of the plaintiff's employment." *Id.* At first glance, Ms. Votolato's allegation that a coworker attempted to run her over in the Verizon parking garage seems similar to the incident in *Noviello*. However, I find the argument unpersuasive here principally because Ms. Machado looked into the incident by speaking to the coworker's husband, who informed Ms. Machado that "that's the way [the coworker] drives."

**\*8** As for the rest of Ms. Votolato's allegations, I find them to be unconvincing as well. In *Alvarado*, the First Circuit noted that although the plaintiff's coworkers' "taunting and mocking comments were both callous and objectionable ... they [did] not constitute the severe or pervasive adverse conduct that the case law recognizes as 'discriminatory changes in the terms and conditions of employment,' ... sufficient to 'establish an objectively hostile or abusive work environment.' " *Alvarado*, 687 F.3d at 462 (internal quotations and citations omitted). Additionally, my colleague Judge Hillman has recognized that "[u]nanimous authority holds ... that a [p]laintiff who is shunned or subjected to the silent treatment after

reporting sexual harassment has not suffered a materially adverse employment action." *Thirkield v. Neary & Hunter OB/GYN, LLC,* 76 F.Supp.3d 339, 350-51 (D. Mass. 2015). More generally, the Supreme Court has acknowledged that "simple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (internal quotations and citations omitted).

Accordingly, the facts that certain of Ms. Votolato's coworkers gave her the cold shoulder, made dirty or menacing looks at her, called her "sneaky," or "unfriended" her on Facebook, do not individually or together amount to what the law recognizes as discriminatory changes in the terms and conditions of employment sufficient to establish an *objectively* hostile or abusive work environment. In sum, even taking the aggregate facts of record in the light most favorable to Ms. Votolato, I cannot conclude that a jury could rationally find that she was subjected to a hostile work environment arising out of retaliation for her complaint against Mr. Lastra.

Verizon further argues that Ms. Votolato fails to establish a causal link between her report and the claimed harassment because she "offers nothing beyond her own speculation to even connect the alleged hostile work environment to her complaints about Mr. Lastra." In support of this contention, Verizon cites *Gourdeau v. City of Newton,* No. 13-12832-LTS, 2016 WL 4975192 (D. Mass. Sept. 16, 2012). Judge Sorokin in *Gourdeau* found that the plaintiff had "not submitted evidence supporting her personal knowledge of the causation connection or any other basis to draw[ ] the inference[;] [although the plaintiff had] personal knowledge that the friendships soured; she ha[d] not advanced evidence regarding why they soured." *Id.* at *1.

Only the incident with Mr. Williams involved a specific reference to Ms. Votolato's complaint about Mr. Lastra. I recognize that "[s]ometimes the temporal sequence of events may support a causation inference." *Gourdeau,* 2016 WL 4975192, at *1. Assuming for the moment that this complaint can be said to have caused hostility by Ms. Votolato's coworkers and is sufficient to support Ms. Votolato's retaliatory hostile environment claim generally, I turn to whether Ms. Votolato has established a causal connection sufficient to support responsibility on the part of Verizon.

### 2. Verizon's Responsibility for a Hostile Work Environment

It is well-settled that "[w]hen a supervisor creates a hostile work environment, the employer is vicariously liable for it, subject, however, to a possible affirmative defense." *Noviello,* 398 F.3d at 94. This defense consists of two elements, which, if proven, permit the employer to escape liability. *Id.* "First, the employer must show that it 'exercised reasonable care to prevent and correct promptly' the harassment." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ). "Second, the employer must show that the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' " *Id.* at 95 (quoting *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257). The First Circuit, however, has held that this type of affirmative defense is not "available under chapter 151B to an employer whose supervisors create a retaliatory hostile work environment." *Id.*

**\*9** In any event, "[w]hen coworkers, rather than supervisors, are responsible for perpetuating a hostile work environment, 'an employer can only be liable if the harassment is causally connected to some negligence on the employer's part.' " *Espinal v. Nat'l Grid NE Holdings 2, LLC,* 794 F.Supp.2d 285, 294 (D. Mass. 2011) (quoting *Noviello,* 398 F.3d at 95). "Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." *Noviello,* 398 F.3d at 95.

Ms. Votolato contends that the "managers, who were responsible for policing the work place, made no attempt to keep [her] complaint of harassment by Larry Lastra quiet." She maintains that the managers "[i]n fact, [ ] did the opposite, [Verizon], by its managers, attempted to set up a situation where retaliation would occur against [Ms. Votolato]." I find this argument unpersuasive. In fact, Ms. Votolato admits that she did not report any of the allegedly "subtle harassment" to management at Verizon. However, when she did come forward, Verizon acted promptly and appropriately. This case is unlike *Noviello* where the plaintiff complained to supervisors about the negative treatment from coworkers and, in turn, those supervisors either took no action or provided fruitless suggestions to the plaintiff. *See Noviello,* 398 F.3d at 82-83.

Furthermore, it is undisputed that Ms. Machado was available to Ms. Votolato and was responsive to her concerns. Ms. Machado shadowed Ms. Votolato to make sure no one was treating her poorly. Yet, Ms. Machado did not witness any improper conduct toward Ms.

Votolato from her fellow union members. Notwithstanding her lack of observation of improper conduct, Ms. Machado asked Ms. Votolato to provide her with the names of the individuals she was referring to and examples of the behavior she was concerned about, but Ms. Votolato refused to provide Ms. Machado with any details. The record is clear that what Verizon knew about from its supervisors resulted in prompt and reasonable action to stop it. It is clear that upon this record Ms. Votolato has not, as a matter of law, established a claim against Verizon for a retaliatory hostile work environment.

### B. Constructive Discharge

Verizon argues that Ms. Votolato's constructive discharge claim fails essentially because her hostile work environment claim fails. Ms. Votolato, for her part, concedes that a successful constructive discharge claim "entails something more" than a mere hostile work environment claim: the plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

Verizon's broader argument on constructive discharge is persuasive. It contends that Ms. Votolato has an obligation "not to assume the worst, and not to jump to conclusions too fast" with regard to whether her working conditions were so intolerable that resignation was the only true option. *Zemrock v. Yankee Candle Co., Inc.*, No. 14-cv-30107-KAR, 2017 WL 506249, at *9 (D. Mass. Feb. 7, 2017). "The standard is an objective one; it 'cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.' " *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) (citing *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000) ).

In *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127 (1st Cir. 2014), the First Circuit took the view that "a reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her." *Id.* at 134-35 (citing *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 441 (7th Cir. 2000) ). In *Kohl's*, the plaintiff was twice asked to discuss accommodations and twice declined. *See id.* Similarly here Ms. Votolato was offered the opportunity to discuss accommodations with Verizon at least three times: in two letters dated June 3 and July 12, 2016 from Ms. Malone, and in a letter from Ms. Schindelar dated July 22. At no time did Ms. Votolato engage Verizon in such

discussions. Nor does she adduce any evidence that suggests these were anything other than appropriate outreach efforts to Ms. Votolato on the part of Verizon.

**\*10** I conclude Ms. Votolato's constructive discharge claim fails the "reasonable person" standard and does not survive summary judgment.

### C. Deceit and Negligent Misrepresentation

As to the fraud counts based on deceit and negligent misrepresentation, Verizon argues that Plaintiff's claim fails on multiple grounds. Because the two torts differ only in the scienter required, and scienter is not at issue at this stage in the proceedings, I discuss the two claims together. *See Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 42 (1st Cir. 2002).

It is well-established that "[u]nder Massachusetts law, claims of fraudulent and negligent misrepresentation require a false representation of material fact, knowledge of falsity or carelessness on the part of the defendant, and a reasonable reliance by the plaintiff." *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 30 (1st Cir. 1998). The speaker need not know the statement is false if "the truth is reasonably susceptible of actual knowledge," or accurate facts are available to the speaker through "a modicum of diligence." *Rodowicz*, 279 F.3d at 42. However, the general rule in Massachusetts is that "statements promissory in nature" and "statements of conditions to exist in the future" are not actionable. *Nationwide Book Indus., LLC v. Weiss*, No. 11-12195-JGD, 2013 WL 5740883, at *13 (D. Mass. Oct. 21, 2013) (quoting *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 226 (D. Mass. 1990) ).

There is a material issue of fact as to what Ms. Schindelar said about the benefits that would be made available to Ms. Votolato. Verizon contends that she said Ms. Votolato's benefits were "going to be approved." This, it argues, cannot support a claim of misrepresentation because it is a statement about a future event not in the control of Verizon, but MetLife.

However, as Ms. Votolato observes in her statement of material facts, Dr. Hancur recalled a more definitive statement from Ms. Schindelar. He recalled Ms. Schindelar stated that Ms. Votolato "had been granted long-term disability by MetLife and that we would – that she could then – we could then go forward with that, you know, with that understanding." He also reported that his purpose in being on the call with Ms. Schinedelar was "to

be certain of Ms. Votolato's understanding of what she was being told...."

A reasonable jury could credit Dr. Hancur's recollection that Ms. Schindelar did make a definitive statement that Ms. Votolato was approved. In light of this material factual dispute, the contested recollections regarding Ms. Schindelar's representations makes the terms of her statement inappropriate grounds for summary judgment.

Similarly unavailing is Verizon's argument that Ms. Votolato could not have reasonably relied on whatever statement was made. Verizon seems to suggest that Ms. Votolato's knowledge that MetLife would make the determination of eligibility is decisive on this issue. However, under Massachusetts law, "the reasonableness of a party's reliance ordinarily constitutes a question of fact for the jury." *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 16 (1st Cir. 2004). Massachusetts courts ordinarily do not dispose of such issues on summary judgment "unless the undisputed facts are so clear as to permit only one conclusion." *Bryan Corp. v. ChemWerth, Inc.*, No. 12-10466-MLW, 2015 U.S. Dist. LEXIS 63458, at *69 (D. Mass. Apr. 2, 2015) (quoting *First Marblehead Corp. v. House*, 473 F.3d 1, 11 (1st Cir. 2006) ).

**\*11** This is not such a case. Here, the record shows that Ms. Votolato had received updates on the status of her MetLife case from Verizon employees. Ms. Malone's July 12, 2016 letter stated: "MetLife has advised that you have now exhausted your Short Term Disability, and that your Long Term Disability (LTD) claim is closed due to failure to submit the LTD packet." In Ms. Schindelar's July 22, 2016 letter, however, she suggestively wrote "that once MetLife has approved," Ms. Votolato would have a benefit start date of July 10, 2016. A reasonable jury could find reasonable reliance based on that communication, in light of the evidence of the parties' interactions as a whole.

Verizon also argues that Ms. Votolato could not have relied on Ms. Schindelar's statement because she would have resigned regardless. Verizon's support for this view rests primarily on Ms. Votolato's statement that when she applied for long-term disability she was "a mess" and "probably would not have been able to return to work." It is bolstered by the fact that Ms. Votolato did not take any action to return to work after her short-term disability expired in July 2016. When Ms. Malone offered her the option of accommodation in the workplace or filing for long-term disability via letter, Ms. Votolato filed for disability, but did not otherwise respond.

Contesting this line of argument by Verizon, Ms. Votolato argues that this too is an issue of fact on which a reasonable jury could find in her favor. That she "probably" would not have been able to return to work at this point does not mean that she would otherwise have terminated her employment altogether. Verizon seems to offer Ms. Votolato's statement as an admission that Ms. Votolato did not rely on Ms. Schindelar's representation. But the probabilistic language a jury could find Ms. Schindelar used weakens Verizon's argument and raises the fact question, among others, whether Verizon had subtly set Ms. Votolato up for failure by structuring potential long range arrangements in a fashion that incentivized her resignation as a way for Verizon to avoid actually paying long-term disability.

There is evidence in the record that suggests Ms. Votolato was engaged in careful and agonizing deliberation about whether to quit while she was in contact with Ms. Schindelar. In her deposition Ms. Votolato recounts: "[B]ecause when I was talking to her on the phone, when she started calling me to pressure me to make my decision.... [I] was, like, well, can I sleep on it and she was, like, well, she almost didn't give me one night to sleep on it." This summary of the interactions, which a reasonable jury could credit, casts doubt on Verizon's narrative that Ms. Votolato had her mind made up.

Tension between the parties' competing narratives based on the evidence of record presents issues properly to be resolved by a factfinder, rather than as a matter of law by the court on a motion for summary judgment.

### IV. CONCLUSION

For the reasons stated more fully above, I granted summary judgment to Verizon as to Ms. Votalato's claims for retaliatory hostile work environment and constructive discharge, and, finding that triable issues of fact remain as to the misrepresentation claims, denied summary judgment for Verizon as to misrepresentation. The Clerk shall set this case for pretrial conference.

### All Citations

Not Reported in Fed. Supp., 2018 WL 4696743

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Votolato v. Verizon New England, Inc., Not Reported in Fed. Supp. (2018)

# EXHIBIT 4

2020 WL 7386311
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Robert BEAUPRE, Plaintiff,
v.
SEACOAST SALES, INC., et al.,
Defendants.

Civil Action No. 18-12080-NMG
|
Signed 12/16/2020

**Synopsis**
**Background:** Former employee, who was over 65 years old, brought action in state court against employer, alleging age discrimination, breach of contract, and breach of the implied covenant of good faith and fair dealing under Massachusetts law, arising from events surrounding employee's termination, which was allegedly due to his age. After removal, defendant moved for summary judgment.

**Holdings:** The District Court, Nathaniel M. Gorton, J., held that:

factual disputes precluded summary judgment on issue of whether employee established a prima facie claim of age discrimination;

factual disputes as to whether the legitimate, nondiscriminatory reason offered for terminating employee was pretextual precluded summary judgment on age discrimination claim; and

contract was unenforceable under the statute of frauds, precluding breach of contract claim.

Motion granted in part and denied in part.

**Attorneys and Law Firms**

Peter Antonelli, Thomas H. Curran, Zachary J. Gregoricus, Christopher Marks, Curran Antonelli, LLP, Boston, MA, for Plaintiff.

Frederick B. Finberg, Peter Bennett, JoAnne I. Simonelli, Sarah Hall, The Bennett Law Firm, P.A., Portland, ME, for Defendants.

**MEMORANDUM & ORDER**

GORTON, United States District Judge

**\*1** This case arises out of the alleged discriminatory treatment and dismissal of Robert Beaupre ("Beaupre" or "plaintiff") from Seacoast Sales, Inc. ("Seacoast") by his boss, John Haddad ("Haddad," collectively with Seacoast, "defendants"). Pending before the Court is defendants' motion for summary judgment on Beaupre's claims.

**I. Background**

**A. The Parties**
Defendant Seacoast is a Maine corporation with its headquarters in Portland, Maine. It is a food broker that assists manufacturers in distributing various food products to grocery stores in several states.

Defendant Haddad is a resident of Portland, Maine. He was an incorporator of Seacoast in 2003 is now its co-owner and Chief Executive Officer ("CEO").

Plaintiff Beaupre is a resident of Lynn, Massachusetts.

**B. Plaintiff's Employment at Seacoast**
Following Seacoast's incorporation in 2003, its first customer was Old Neighborhood Foods ("Old Neighborhood"), a deli products manufacturer in Lynn, Massachusetts. Beaupre was then Vice President of Retail Sales for Old Neighborhood and had worked in various roles at that company over several decades.

In 2014, Haddad hired Beaupre to work part-time as an outside consultant for Seacoast. During the next several years, Haddad and Beaupre discussed the possibility of a full-time position for Beaupre at Seacoast. In 2016, Haddad offered plaintiff a newly-created sales position at Seacoast. Prior to Beaupre's hiring, Haddad had been the only salesperson at Seacoast.

Plaintiff accepted the offer and began work as Seacoast's Director of Sales in November, 2016. At the time, he was 65 years old and had more than 40 years of relevant work experience. Defendants submit that Beaupre was hired specifically to develop new business with Market Basket, BJ's Wholesale Club ("BJ's"), Shaw's and Restaurant Depot. Beaupre denies that his employment was thus limited and maintains that his responsibility included expanding sales of all existing and future accounts.

### C. The Employment Agreement and Benefits Dispute

Although there was no written employment agreement between Seacoast and Beaupre, the parties agreed that Beaupre was to receive an annual salary of approximately $110,000 for his services. They discussed a plan for Beaupre to receive a commission if his sales revenue exceeded his salary. Defendants also submit that Beaupre had the right to participate in the company's health insurance and 401(k) retirement plans.

In October, 2017, the insurance broker of Seacoast's health insurance plan informed Haddad that Beaupre was eligible for Medicare. After Haddad discussed the matter with him, Beaupre agreed to enroll in a Medicare plan in December, 2017. Haddad contends that he left the decision to switch plans up to Beaupre but Beaupre responds that Haddad forced him to leave Seacoast's plan because his age was driving up the premiums. Seacoast continued to pay Beaupre's health insurance premiums under the Medicare plan.

Plaintiff alleges that Haddad informed him in December, 2017, that he would no longer be allowed to participate in Seacoast's 401(k) plan because of his age. Defendants rejoin, however, that Haddad never prohibited Beaupre from participating in its plan and that Seacoast even attempted to make a contribution to his 401(k) account. Beaupre replies that the attempted contribution occurred only after he was terminated and this litigation had commenced.

### D. Hiring of Peter McArdle

**\*2** In November, 2017, Haddad hired his brother in law, Peter McArdle ("McArdle"), who is approximately 20 years younger than Beaupre. Defendants maintain that McArdle was hired to develop a beverage division for Seacoast and that there was no plan to involve him in Seacoast's food business. Plaintiff responds that McArdle began selling food products for Seacoast within weeks of his hiring and asked to accompany plaintiff on trips to clients and retailers to which Seacoast sold food products.

Shortly after hiring McArdle, Haddad promoted him to President of Seacoast.

### E. Plaintiff's Performance and Termination

During his first year of employment, Beaupre's sales were under $15,000 and were all attributable to existing Seacoast customers. His effort to secure new business from various grocery store chains was either ongoing or unsuccessful.

In November, 2017, Haddad and Beaupre met for a performance review during which they discussed the fact that Beaupre's sales had not covered his expenses.

In January, 2018, Haddad terminated plaintiff's employment, citing his poor sales performance. Beaupre contends that McArdle assumed most, if not all of his former responsibilities immediately after his termination.

### F. Procedural History

In April, 2018, Beaupre filed an action with the Massachusetts Commission Against Discrimination ("MCAD"). In August, 2018, he filed a civil complaint in the Massachusetts Superior Court for Essex County alleging discrimination on the basis of age in violation of M.G.L. c. 151B § 4 against both defendants (Counts I and II) and breach of contract and of the implied covenant of good faith and fair dealing against Seacoast (Counts III and IV).

Defendants timely removed the case to this Court on diversity jurisdiction ground and, in July, 2020, filed the

instant motion for summary judgment.

## II. Motion for Summary Judgment

### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law ...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23, 106 S.Ct. 2548.

### B. Arguments of the Parties

Beaupre alleges that defendants discriminated against him on the basis of age in violation of M.G.L. c. 151B § 4. He contends that 1) defendants terminated his employment solely because of his advanced age and replaced him with a younger employee and 2) unlawfully prohibited him from participating in Seacoast's health care and 401(k) plans despite their agreement to the contrary. That

conduct, Beaupre avers, constitutes not only unlawful age discrimination but also a breach of his employment contract. Finally, Beaupre alleges that Seacoast breached the implied covenant of good faith and fair dealing by terminating his employment in order to deprive him of earned commissions.

**\*3** With respect to the age discrimination claims, defendants respond that Beaupre can neither establish a prima facie case of age discrimination nor demonstrate that he was denied access to company benefits because of his age. They also submit that plaintiff cannot succeed on his remaining claims because 1) he was an at-will employee without a written employment contract, 2) the alleged oral employment agreement is unenforceable under the statute of frauds and 3) there is no evidence that he was terminated to deprive him of commissions.

### C. Analysis

#### 1. Counts I and II – Violation of M.G.L. c. 151B § 4 (Age Discrimination)

As a procedural matter, plaintiff's age discrimination claims relate to both the termination of his employment (Count I) and the denial of benefits (Count II). Nevertheless, the allegations in both counts require the same legal analysis and the parties treat the claims as interrelated. Accordingly, this Court will address together all claims in Counts I and II.

Massachusetts law provides that it is unlawful

> [f]or an employer in the private sector, ... because of the age of any individual, ... to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

M.G.L. c. 151B § 4(1B). When direct evidence of age discrimination is unavailable, Massachusetts courts apply the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination by demonstrating that he or she

(1) was a member of the class protected by G. L. c. 151B (that is, over forty years of age); (2) had performed [his or] her job at an acceptable level; (3)

was terminated; and (4) was replaced by a similarly or less qualified younger person.

Knight v. Avon Prods., 438 Mass. 413, 420-21, 780 N.E.2d 1255 (2003). With respect to the fourth element, the plaintiff must show that the employer "sought some form of replacement performance," demonstrating a "continued need for the same services and skills." Hidalgo v. Overseas Condado Ins. Agencies, 120 F.3d 328, 332-33 (1st Cir. 1997) (internal citations and quotations omitted).

Once a prima facie case has been made, the burden shifts to the defendants to rebut the presumption of discrimination by offering a legitimate, nondiscriminatory reason for their employment action. See Blare, 419 Mass. at 441, 646 N.E.2d 111. If they do so, the plaintiff must then produce evidence demonstrating that the defendants' stated reason was pretext. Id. at 443-45, 646 N.E.2d 111.

There is no dispute that Beaupre has satisfied the first and third elements with respect to his prima facie case but defendants dispute that he has established the second and fourth elements. They assert that 1) Beaupre's low sales revenue indicates that he did not perform his job at an acceptable level and 2) he was not replaced by McArdle, who was hired before Beaupre's termination and was assigned different responsibilities. They insist that even if Beaupre could demonstrate that McArdle was hired as his replacement, McArdle possesses far superior qualifications.

Viewing the evidence in the light most favorable to plaintiff, a reasonable factfinder could find that Beaupre has met all four elements required to establish a prima facie case of discrimination under M.G.L. c. 151B § 4. The undisputed evidence shows that Beaupre was hired to be the Director of Sales for Seacoast. He has proffered evidence that he was responsible for a broad range of tasks beyond merely acquiring new business from a small number of specific entities and, other than his low first-year sales figures, there is no evidence that his performance was less than adequate. In fact, plaintiff testified that Haddad gave him a positive performance review in November, 2017. See Blare v. Husky Injection Molding Sys. Boston, 419 Mass. 437, 446, 646 N.E.2d 111 (1995) (concluding that the record supported a prima facie case where "[t]he periodic reviews in the plaintiff's file ... indicate that he consistently and conscientiously performed his job").

**\*4** Furthermore, Beaupre has presented evidence that he was replaced by a similarly-qualified much younger person. It is undisputed that Beaupre was 66 years old and McArdle 47 years old at the time Beaupre was terminated.

Although McArdle was perhaps initially hired to help create a beverage division at Seacoast, he assumed most of Beaupre's responsibilities immediately after Beaupre's termination. The fact that McArdle was hired prior to Beaupre's termination and did not assume the title of Director of Sales is immaterial to the replacement analysis. See Loeb v. Textron, Inc., 600 F.2d 1003, 1013 n.11 (1st Cir. 1979) ("A replacement need not be sought from outside the company, of course, nor need he be designated formally as such."). With respect to qualifications, both men had many years of relevant experience. Although McArdle has extensive managerial experience in the beverage industry, there is no indication that he was even as experienced as Beaupre in the sale of food products. Ultimately, the comparison of the job responsibilities and qualifications of each employee is a question of material fact that is best suited for a jury to determine.

In response to plaintiff's alleged establishment of a prima facie case of discrimination, defendants assert that Beaupre performed poorly as Director of Sales, thus warranting his termination. They emphasize that Beaupre generated less than $15,000 in sales revenue during his first year at Seacoast, substantially less than his salary. Accordingly, defendants have proffered a legitimate, nondiscriminatory reason for his termination. Thus, plaintiff must demonstrate that the proffered reason was a mere pretext for discrimination.

Once again viewing the record in the light most favorable to plaintiff, Beaupre has raised a genuine dispute as to whether defendants' stated reason for terminating his employment was pretextual. Despite defendants' claim that they were disappointed with the sales revenue generated by plaintiff, Beaupre has testified that Haddad expressed satisfaction with his performance at a meeting in November, 2017. Beaupre has provided consistent text messages that were sent to him by Haddad in December, 2017, and evidence that at least some of his former job responsibilities were assumed by the younger McArdle following his termination.

Defendants maintain that they are entitled to the so-called "same actor inference," which creates "a strong inference ... that discrimination was not a determining factor" in an employee's termination where the person who hired and fired are the same. Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 46 (1st Cir. 2019). The Supreme Judicial Court of Massachusetts has stated, however, that it is inappropriate for a court to apply such an inference on summary judgment. See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 474 Mass. 382, 404 n.32, 50 N.E.3d 778 (2016) (concluding that

considering the same actor inference on summary judgment would be inconsistent with the protocol that we draw all reasonable inferences in the light most favorable to the plaintiff).

Finally, the record indicates that a reasonable jury could find that Beaupre was denied participation in Seacoast's healthcare and retirement plans because of his age. The evidence submitted by plaintiff indicates that Haddad informed him in late 2017 that he was no longer welcome to participate in the healthcare and 401(k) plans offered by Seacoast because of concerns related to his advanced age. In fact, the record establishes that Haddad encouraged Beaupre to enroll in a Medicare plan instead of Seacoast's healthcare plan. Although defendants explain that they eventually attempted to contribute to Beaupre's 401(k) account, plaintiff has countered that the attempt occurred only after his termination and the commencement of litigation and was conditioned on the waiver of his rights to sue defendants. Accordingly, there is a clear dispute of material fact as to the alleged denial of benefits.

Because a reasonable factfinder could determine that defendants were motivated by age-based discrimination in denying benefits to plaintiff and terminating his employment, defendants' motion for summary judgment will, with respect to Counts I and II, be denied.

## 2. Count III - Breach of Contract

**\*5** Defendants contend that plaintiff cannot sustain his breach of contract claim because 1) he was an at-will employee who can be terminated for any reason, 2) the oral employment agreement cannot be enforced under the statute of frauds and 3) he suffered no damages.

To prove a breach of contract claim under Massachusetts law, a plaintiff must demonstrate that an enforceable contract existed, the defendant breached that contract and the plaintiff suffered damages. See Valle v. Powertech Indus. Co., Ltd., 381 F. Supp. 3d 151, 160 (D. Mass. 2019). At-will employees cannot generally succeed on such a claim, however, because they may be terminated for any reason at any time. See Merricks v. Savers, Inc., 2012 WL 32579, at \*5, 2012 U.S. Dist. LEXIS 1568, at \*15 (D. Mass. 2012); Bergeson v. Franchi, 783 F. Supp. 713, 717 (D. Mass. 1992). Employees are considered to be employed at will in the absence of a contract for a definite period of employment. Cf. Willitts v. Roman Catholic Archbishop, 411 Mass. 202, 209, 581 N.E.2d 475 (1991) ("Because the plaintiff's employment contract

contained a definite period of employment, she was not an employee at will.").

The parties dispute whether Beaupre was an at-will employee. Defendants contend that he was employed at-will because Seacoast did not promise to employ him for a definite term. Plaintiff responds that defendants' assertion lacks factual support and insists that Seacoast promised to employ him for a definite term.

Although he now maintains that he was promised employment for a term of 10 years, Beaupre failed to so allege in his complaint. Indeed, Count III of the complaint alleges only that Seacoast breached its agreement with Beaupre by 1) failing to pay for Beaupre's health insurance under the company's plan and 2) refusing to allow Beaupre to participate in the company's 401(k) plan. The complaint contains no allegations that defendants promised him employment for a definite term. Summary judgment "is not a procedural second chance to flesh out inadequate pleadings." Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990); see also Nieves v. University of P.R., 7 F.3d 270, 280 (1st Cir. 1993) (explaining that "a party may not generate a trialworthy dispute at summary judgment merely by presenting unsubstantiated allegations in its memoranda or briefs").

Although at-will employees generally cannot succeed on breach of contract claims, Massachusetts law contains narrow exceptions for violations of public policy or to prevent unjust enrichment of an employer. Merricks, 2012 WL 32579, at \*5, 2012 U.S. Dist. LEXIS 1568, at \*15. The public policy exception is limited to circumstances in which at-will employees

> are terminated for asserting a legally guaranteed right (e.g. filing workers compensation claims), for doing what the law requires (e.g. serving on a jury), or for refusing to do that which the law forbids (e.g. committing perjury).

Id. at \*6, 2012 U.S. Dist. LEXIS 1568, at \*16 (quoting Smith-Pfeffer v. Superintendent of Walter E. Fernald State School, 404 Mass. 145, 149-50, 533 N.E.2d 1368 (1989)). Beaupre makes no such allegations and thus the public policy exception is inapplicable here.

The exception for unjust enrichment is limited to cases in which an employer "fires an employee and thereby deprives him or her of bonuses, commissions, or wages." Id. at \*5, 2012 U.S. Dist. LEXIS 1568, at \*15-16, quoting Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 477 n.1, 589 N.E.2d 1241 (1992). That exception is also referred to as the exception for breach of the covenant of good faith and fair dealing. Id. Because

Beaupre v. Seacoast Sales, Inc., --- F.Supp.3d ---- (2020)

Beaupre alleges in Count IV such a breach based on the claim that Seacoast terminated his employment to deprive him of commissions, this Court will analyze whether summary judgment is appropriate on that claim.

**\*6** In any event, even if Beaupre were not an **at-will** employee, defendants would be entitled to summary judgment on plaintiff's **breach of contract** claim.

First, with respect to the 401(k) plan, the record indicates that employees were not eligible to participate until they had completed one year of employment and 1,000 working hours. Because the terms of the plan make it impossible for the employee to qualify within one year, the contract is unenforceable under the statute of frauds as to the 401(k) plan. See Moog, Inc. v. ClearMotion, Inc., 2020 WL 6162921, at \*5, 2020 U.S. Dist. LEXIS 194913, at \*14 (D. Mass. 2020) ("Under Massachusetts law, the Statute of Frauds ... requires that any contract that cannot be fully performed within one year of its making be reduced to writing to be enforceable."). In his opposition, Beaupre contends that because he relied on defendants' promises they cannot invoke the statute of frauds to prevent enforcement of the contract. He failed to plead promissory estoppel or detrimental reliance in his complaint, however, and therefore he may not rely on such legal theories now. See Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006) ("[Plaintiff] is not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.").

Second, with respect to the healthcare plan, there is no evidence in the record to indicate that Beaupre incurred damages as a result of defendants' alleged breach of his employment contract. Indeed, plaintiff admits that defendants paid the premiums owed under the Medicare plan and that coverage was similar to his coverage under Seacoast's plan. Because damages are an essential element of a breach of contract claim, see Valle, 381 F. Supp. 3d at 160, that claim is unavailing.

Accordingly, defendants' motion for summary judgment will, with respect to Count III, be allowed.

## 3. Count IV – Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants assert that there is no evidence on the record to support plaintiff's claim that defendants terminated him to deprive him of commissions. For that reason, defendants submit they are entitled to summary judgment

on Count IV.

Massachusetts courts have recognized an implied covenant of good faith and fair dealing in every employment relationship, including some at-will relationships. See Merricks, 2012 WL 32579, at \*5, 2012 U.S. Dist. LEXIS 1568, at \*15; Wright, 412 Mass. at 477 n.1, 589 N.E.2d 1241. One of only two exceptions to the general rule that employers cannot be held liable for the termination of at-will employees, the implied covenant of good faith and fair dealing "is very narrow and fact specific" and courts only impose liability where

> employers would unjustly benefit financially by depriving the employees of future compensation earned for past services.

Bergeson, 783 F. Supp. at 717 (citing Fortune v. National Cash Register Co., 373 Mass. 96, 102, 364 N.E.2d 1251 (1977)).

Beaupre submits that Seacoast terminated his employment to deprive him of commissions that would have been due to him upon securing two new accounts for Seacoast, namely BJ's and Market Basket, which he declares were imminent.

First, it is undisputed that the oral employment agreement between Beaupre and Seacoast did not contemplate the payment of commissions until Beaupre generated enough sales revenue to exceed his salary. In light of the fact that Beaupre did not come close to that prerequisite during his first year at Seacoast, it appears unlikely that he would have been entitled to a commission even if he had procured the prospective accounts before he was fired.

**\*7** Furthermore, it is undisputed that neither account was procured during plaintiff's employment and, although plaintiff asserts in his complaint that Seacoast got those accounts after his termination, Beaupre admits in his November, 2019 deposition that he has no personal knowledge as to whether either transaction was eventually consummated. "The Fortune doctrine does not protect interests contingent on an event that has not occurred." Harrison v. NetCentric Corp., 433 Mass. 465, 485, 744 N.E.2d 622 (2001). While employees are generally entitled to commissions on sales that were already made, they are not entitled to commissions on sales yet to completed. Compare Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 429 N.E.2d 21 (1981) (holding that the discharged employee was entitled to commissions from sales already made), with Smith v. Unidine Corp., 2017 WL 4411249, at \*5-6, 2017 Mass. Super. LEXIS 137, at \*15-16 (Mass. Super. 2017) (holding that there was no breach of the implied covenant of good faith and fair dealing where commissions were not yet earned by the

employees prior to their termination).

Accordingly, defendants' motion for summary judgment will, with respect to Count IV, be allowed.

## ORDER

For the foregoing reasons, the motion of defendants John Haddad and Seacoast Sales, Inc. for summary judgment

(Docket No. 61) is, with respect to Counts III and IV, **ALLOWED,** but otherwise, **DENIED**.

**So ordered.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 7386311

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2012 WL 32579
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Robin MERRICKS, Plaintiff,
v.
SAVERS, INC., Defendant.

Civil Action No. 11–10956–DJC.
|
Jan. 6, 2012.

**Attorneys and Law Firms**

Jeffrey R. Mazer, Law Offices of Jeffrey R. Mazer, Timothy S. Bolen, Mazer Law Group, LLC, Lynnfield, MA, for Plaintiff.

Emily Moloney Smith, Edwards Wildman Palmer LLP, Timothy P. Van Dyck, Edwards Angell Palmer & Dodge LLP, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

CASPER, District Judge.

**I. Introduction**
**\*1** Plaintiff Robin Merricks ("Merricks") brings this action against her former employer, Savers, Inc. ("Savers") asserting claims of promissory estoppel, breach of contract and violation of Mass. Gen. Laws c. 151B in connection with the termination of her employment. Savers has now moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons discussed below, Savers' motion to dismiss is GRANTED in part and DENIED in part.

**II. Burden of Proof and Standard of Review**
To survive a motion to dismiss, a complaint "must 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests,' and allege 'a plausible entitlement to relief.' " *Decotiis v. Whittemore,* 635 F.3d 22, 29 (1st Cir.2011) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). As the First Circuit has made clear, "[i]n resolving a motion to dismiss, a court should employ a two-pronged approach." *Ocasio–Hernández v. Fortuño–Burset,* 640 F.3d 1, 12 (1st Cir.2011) (applying *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) and *Twombly,* 550 U.S. at 555). "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.' " *Id.* (quoting *Iqbal,* 129 S.Ct. at 1949–50 (further citation omitted)). The remaining "[n]on-conclusory factual allegations in the complaint must be then treated as true, even if seemingly incredible" and assessed to determine whether they, " 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Iqbal,* 129 S.Ct. at 1949, 1951). If they do, "the claim has facial plausibility." *Id.* (quoting *Iqbal,* 129 S.Ct. at 1949). "The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Id.* (quoting *Sepúlveda–Villarini v. Dep't of Educ. of P.R.,* 628 F.3d 25, 29 (1st Cir.2010) (Souter, J.)).

**III. Factual Background**
On December 23, 2008, Merricks applied for and was offered a position as an Assistant Operations Supervisor ("AOS") at a Savers store located in Plymouth, Massachusetts. (Compl.¶ 3).[1] Prior to accepting this offer, Merricks met with Store Manager Geri Amaral and Operations Supervisor Eric Melancon. (Compl.¶ 4). During this meeting, Merricks indicated that she was interested in the AOS position, but that she needed two and a half weeks off in May to attend her son's out-of-state high school graduation and to help him move back home. (Compl.¶ 5). Merricks alleges that Amaral and Melancon assured her that "this would not be a problem," but also informed her that she would not be paid for such leave. (Compl.¶ 6). On January 5, 2009, Merricks commenced her employment at the Savers store in Plymouth. (Compl.¶ 8). From this date until April 17,

2009, Merricks worked all of her scheduled shifts. (Compl.¶¶ 8–11).

**\*2** Over three months later, on April 17, 2009, Merricks became ill at work. (Compl.¶ 10). Savers' district manager suggested that Merricks leave and visit her doctor. (Compl.¶ 11). Merricks was subsequently diagnosed with a severe sinus infection and mononucleosis and was instructed not to return to work until April 23, 2009. (Compl.¶ 12). Merricks immediately informed Amaral of her illness and that she would not be able to return to work until April 23, 2009. (Compl.¶¶ 13–14). Savers scheduled Merrick's return for April 25, 2009. (Compl.¶ 15).

Upon her return to work on April 25, 2009, Merricks worked her full schedule. (Compl.¶ 16). She continued to work her full schedule until May 5, 2009, at which time Merricks alleges she was scheduled to take her "pre-approved" leave from May 6, 2009 to May 26, 2009 to attend her son's graduation. (Compl.¶¶ 16–17). When asked by Amaral to return to work on May 25 instead of May 26, 2009, Merricks agreed to do so. (Compl.¶¶ 18–19). Prior to leaving on May 5, 2009, Amaral asked Merricks to complete a leave of absence form. (Compl.¶ 20). Merricks claims that Amaral had never previously indicated that there may be a problem with her leave. (Compl.¶ 21).

While on leave, on May 15, 2009, Merricks contacted Amaral to inquire about her direct deposit paycheck that had not been deposited in her bank account. (Compl.¶ 22). Amaral responded that her leave of absence had not been approved and that Merricks had been terminated because she took an unapproved leave of absence. (Compl.¶ 23). Amaral further stated that she would mail a paper copy of Merricks's final pay check to her. (Compl.¶ 24). One week later, on May 22, 2009, Merricks called the Savers store in Plymouth and spoke to Melancon. (Compl.¶ 25). Melancon told Merricks that he was unsure why there was a problem. (Compl.¶ 26). Merricks alleges that Melancon presumed that her time off in April, while recovering from illness, had caused her to miss too many days from work, thus resulting in her termination. (Compl.¶ 27).

## IV. Procedural History

On April 11, 2011, Merricks filed a verified complaint in Plymouth Superior Court, asserting claims of promissory estoppel (Count I), handicap discrimination in violation of Mass. Gen. L. c. 151B (Count II) and breach of contract (Count III).(D.5). Savers subsequently removed this

action to this Court. (D.1). Savers has now moved to dismiss the complaint pursuant to Rule 12(b)(6) and the Court has heard oral argument on the motion.

## V. Discussion

### A. Count I: Promissory Estoppel

At base, Merricks alleges that she relied to her detriment on Amaral and Melancon's representation regarding her ability to take a leave of absence in May of 2009. To establish a promissory estoppel claim, a plaintiff must show that "(1) [defendant] ma[de] a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only be enforcement of the promise." *Carroll v. Xerox Corp.,* 294 F.3d 231, 242 (1st Cir.2002) (quoting *Loranger Const. Corp. v. E.F. Hauserman Co.,* 6 Mass.App.Ct. 152, 154, 374 N.E.2d 306 (1978)). A promise is a " 'manifestation of an intention to act or refrain from acting in a specified way, so as to justify a promisee in understanding that a commitment has been made.' " *Rhode Island Hosp. Trust Nat'l Bank v. Varadian,* 419 Mass. 841, 849–50, 647 N.E.2d 1174 (1995) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2 (1981)). "[A]n essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." *Id.* at 848, 647 N.E.2d 1174 (internal citations and quotation marks omitted). "Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice." *Steinke v. Sundard Fin. Sys., Inc.,* 121 F.3d 763, 776 (1st Cir.1997); *see also Bosque v. Wells Fargo Bank, N.A.,* 762 F.Supp.2d 342, 353 (D.Mass.2011) (noting that promissory estoppel is "usually asserted as an alternative theory of recovery for a contract that is not supported by consideration"); *Durmic v. J.P. Morgan Chase Bank, NA,* 2010 WL 4825632, at *5 (D.Mass. Nov.24, 2010) (same).

**\*3** Viewing the complaint in the light most favorable to Merricks, the complaint sufficiently alleges that Savers promised Merricks that she would be able to take a leave of absence in May. The complaint alleges that Savers (through Amaral and Melancon) told Merricks that if she accepted employment with them, taking a two-and-a-half week leave in May to attend her son's graduation and

move him back home "would not be a problem." (Compl.¶ 6). Savers argues that Merricks' promissory estoppel claim must fail because if any promise was made by Amaral and Melancon, it was not an unambiguous promise. (Def. Memo 5–6). The fact that the complaint does not allege that the specific dates of her May leave were discussed does not render the promise ambiguous. Contract law does not "require[ ] that all terms of [an] agreement be precisely specified, and the presence of ... unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys. v. Malouf, Inc.,* 430 Mass. 875, 878, 724 N.E.2d 699 (2000). The same principle applies here. The complaint alleges that during her conversation with Amaral and Melancon, Merricks identified the length of time for the leave, the month in which she would take that leave and the reason for the leave. It is reasonable to infer that the promise that the leave under such terms would not be a problem contained sufficient essential terms so as not to be ambiguous.

Under these circumstances, the complaint alleges sufficient facts making it at least plausible that Merricks' reliance on this purported promise was reasonable. Merricks alleges that at the outset of her interview with Amaral and Melancon, she raised her concern about being able to take a leave of absence in May. Amaral and Melancon, both alleged to be in a position of authority to extend to Merricks an offer of employment at the time, told her that it would not be a problem. Although the phrase that taking leave "would not be a problem" could have numerous meanings in this context, Merricks alleges that it meant if she became a Savers employee, she would be able to take a leave of absence without being terminated. What was precisely said during Merricks' interview and what Amaral and Melancon actually meant by those words is a matter of fact left for discovery, *see Frederick v. ConAgra, Inc.,* 713 F.Supp. 41, 45–46 (D.Mass.1989) (denying summary judgment where disputed questions of material fact included the exact terms of the employment agreement and the representations actually made during negotiations for employment upon which plaintiff claims he reasonably relied to his detriment in leaving his previous job to be employed and later terminated by defendant), but the facts as alleged in the complaint are sufficient for the purposes of pleading a plausible promissory estoppel claim.

Defendants argue that in light of Merricks' allegation that she was an at-will employee (Compl.¶¶ 60, 62), Merricks' reliance on this promise was unreasonable since at-will employees can be "terminated at any time for any reason or for no reason at all" unless the "at-will employee is terminated for a reason that violates a clearly established

public policy." *Upton v. JWP Businessland,* 425 Mass. 756, 757, 682 N.E.2d 1357 (1997) (citing cases); *see Artuso v. Vertex Pharm., Inc.,* 637 F.3d 1, 8 (1st Cir.2011). Despite Savers' argument to the contrary, the fact that Merricks was an at-will employee does not defeat her promissory estoppel claim at this stage. *See, e.g., Masso v. United Parcel Serv. of Am., Inc.,* 884 F.Supp. 610, 619 (D.Mass.1995) (denying motion to dismiss as to plaintiff's promissory estoppel claim where although he was an at-will employee, plaintiff reasonably relied on an implied promise that employer would not terminate him for engaging in conduct instructed by supervisors). The factual allegations in the complaint, taken as true, sufficiently allege that Merricks received a promise from Savers that she could take a leave of absence in May if Savers hired her and that when she took such leave as an employee, she could do so without being terminated.

**\*4** The circumstances of this case stand in stark contrast to those in *Fitzgerald v. Queen Anne Nursing Home, Inc.,* 61 Mass.App.Ct. 1103 (2004) (Table), upon which Defendants primarily rely for their argument that Merricks' reliance here was unreasonable. There, the Massachusetts Appeals Court ruled on the defendant's appeal from a jury verdict for the plaintiff on her promissory estoppel claim that she, an at-will employee, was not entitled to judgment where she was terminated after taking a leave of absence authorized by her supervisor. *Id.* In reversing the judgment, the Court found that the evidence did not support the plaintiff's claim that she had reasonably relied on an unambiguous promise by her supervisor in a contractual sense to support her claim. *Id.* The Court explained that even though the plaintiff's supervisor encouraged her to take a leave of absence, those conversations did not "create a contractual commitment between the parties" so far as to "convert [ ] the plaintiff's employment to something other than 'at will.' " *Id.* However, unlike *Fitzgerald,* the agreement Merricks alleges she made with Savers occurred in the context of pre-employment discussions with Amaral and Melancon, not post-employment promises regarding a leave of absence. Merricks alleges that but for Amaral and Melancon's promise during that conversation that she could take her leave in May, she would not have accepted employment at Savers. It is certainly plausible, based on the facts alleged in the complaint, that Merricks reasonably relied on the representation made to her during her interview that if she accepted the position, she could take such leave.

The complaint also sufficiently alleges that Merricks relied upon Savers' promise to her detriment. Merricks alleges that she ceased her job search to accept

employment with Savers, a job she only further pursued because of Savers' promise that she would be able to take a leave of absence in May. But for Savers' promise, Merricks alleges she would have sought employment elsewhere, but instead accepted employment with Savers, took her pre-approved leave and was terminated when she did so. *See Grant v. John Hancock Mutual Life Ins. Co.,* 183 F.Supp.2d 344, 370 (D.Mass.2002) (denying summary judgment as to plaintiff's promissory estoppel claim where a triable issue existed regarding whether the employee's reliance was reasonable where he ceased his job search and moved to take a position with defendant company based on the representations made to him about his job responsibilities).

Accordingly, because the factual allegations in the complaint are sufficient to state a plausible promissory estoppel claim, Savers' motion to dismiss Count I is DENIED.

### B. Count III: Breach of Contract

To state a claim for breach of contract, a plaintiff must show "(1) that the parties reached a valid and binding agreement ... (2) that [defendant] breached the terms of [that agreement] ... and (3) that [plaintiff] suffered damages as a result [of] the breach." *Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995). The essential elements of a contract are an offer, acceptance, and an exchange of consideration or meeting of the minds. *Vadnais v. NSK Steering Sys. Am., Inc.,* 675 F.Supp.2d 205, 207 (D.Mass.2009) (citing *Quinn v. State Ethics Comm'n,* 401 Mass. 210, 216, 516 N.E.2d 124 (1987)).

**\*5** Even accepting the allegations in the complaint as true, Merricks has failed to state a plausible breach of contract claim. Read in the light most favorable to Merricks, the breach of contract claim is based on the agreement she alleges she made with Amaral and Melancon at her interview. Although Merricks presses this separate breach of contract claim, the allegations in support of this claim are framed in the context of her detrimental reliance upon Savers' alleged promised that she could take (unpaid) leave in May. (Compl.¶¶ 51–66). These allegations mirror the allegations made in support of her promissory estoppel claim (Count I). *Compare* Compl. ¶¶ 1–32 *with* Compl. ¶¶ 51–66. However, as discussed above, asserting a separate breach of contract claim requires alleging the essential element of consideration. "A contract must have consideration to be enforceable and in order for a contract to have valid consideration, the contract must be a

bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." *Neuhoff v. Marvin Lumber and Cedar Co.,* 370 F.3d 197, 201 (1st Cir.2004) (internal quotation marks omitted). Merricks makes no allegation of consideration or "meeting of the minds" between the parties in her complaint.

Even if the complaint alleged consideration for Merricks' alleged contract with her employer, because Merricks alleges she became an at will employee, Savers could have terminated that employment agreement for any reason at any time. *See Upton,* 425 Mass. at 757, 682 N.E.2d 1357. It is well-settled in Massachusetts, subject to limited exceptions for violations of public policy or to prevent unjust enrichment to an employer, that an **at-will** employee cannot succeed on a **breach of contract** claim arising from a change in the terms and conditions of her employment. *See, e.g., Bergeson v. Franchi,* 783 F.Supp. 713, 717–18 (D.Mass.1992) (holding that **at-will** employee's **breach of contract** claim fails because, absent showing of bad faith or violation of public policy, an **at-will** relationship is terminable at any time for any reason). At oral argument, counsel for Merricks argued that the exception for breach of the covenant of good faith and fair dealing applies here, claiming that Savers breached the covenant of good faith and fair dealing when they agreed to allow Merricks to take a leave of absence and then terminated her for taking such leave. Although the Supreme Judicial Court has recognized an implied covenant of good faith and fair dealing in every employment relationship, including some at-will relationships, it has limited this exception "to cases in which an employer fires an employee and thereby deprives him or her of bonuses, commissions, or wages." *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 477 n. 1, 589 N.E.2d 1241 (1992). Liability is only imposed under this exception "where employers would unjustly benefit financially by depriving the employees of future compensation earned for past services." *Bergeson,* 783 F.Supp. at 717 (citing cases). The loss of income for future services is not bound by the good faith duty. *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 672, 429 N.E.2d 21 (1981) (noting the "distinction between the loss of future wages for past service ... and the loss of future income for future services") (citing cases). Because Merricks has not alleged nor argued the loss of wages or commissions for past services, this exception does not apply.

**\*6** The second exception may subject an employer to liability when an employee's termination violates a clearly established public policy. *Hobson v. McLean Hosp. Corp.,* 402 Mass. 413, 416, 522 N.E.2d 975 (1988);

*DeRose v. Putnam Mgmt. Co., Inc.,* 398 Mass. 205, 210, 496 N.E.2d 428 (1986). Like the exception for preventing unjust enrichment to an employer, the public policy exception applies only in limited instances. A remedy is available under the public policy exception for at-will employees "who are terminated for asserting a legally guaranteed right (e. g. filing workers compensation claims), for doing what the law requires (e.g. serving on a jury), or for refusing to do that which the law forbids (e.g. committing perjury)." *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State Sch.,* 404 Mass. 145, 149–50, 533 N.E.2d 1368 (1989). "Courts are hesitant, however, to create a new cause of action, only doing so when there is no other way to vindicate such public policy." *Bergeson,* 783 F.Supp. at 717 (internal quotation marks and citation omitted).

At oral argument, Merricks argued that this public policy exception applies because Savers made "a material misrepresentation about the nature of employment at a point in time when [Merricks was] truly in a vulnerable position because they're getting all the information they can have about this job," Tr. 19: 19–25, relying on *Pitney v. Table Talk Pies, Inc.,* 2004 WL 3313445, at *3 (Mass.Super.Ct. Mar. 22, 2005). In *Pitney,* the employer represented to the plaintiff during his interview that the position at the company would be a managerial position. *Id.* at * 1. After leaving his current employer and accepting the new position, the plaintiff realized after a couple of months on the job that he was not given the duties that corresponded with the managerial position for which he thought he was hired. *Id.* In denying the employer's motion for summary judgment on plaintiff's promissory estoppel claim, the Court found that the plaintiff had stated a valid breach of contract claim (despite no separate breach of contract claim asserted in the complaint), stating that, "it is certainly a violation of public policy for an employer to induce an employee to give up a job and take a new position on the basis of material misrepresentations about the nature of the position for which the employee is hired." *Id.* at *3. Although *Pitney* does not necessarily appear to accurately reflect the Supreme Judicial Court's stringent standard in applying the public policy exception in at-will employment cases, *see, e.g., Smith–Pfeffer,* 404 Mass. 149–50; *Upton,* 425 Mass. at 759–60, 682 N.E.2d 1357, *Pitney* is nonetheless distinguishable from the instant case. Here, the complaint does not allege that Savers misrepresented the "nature" of Merricks' position, a fact at the heart of the *Pitney* decision. Merricks neither alleges nor argues that the position for which she applied, was interviewed and accepted was different than the one she assumed during her employment. It cannot be said that, as alleged, Savers' actions rise to the level of a

violation of an important public policy as contemplated by the Supreme Judicial Court.

**\*7** Because Merricks is an at-will employee and she does not allege she falls within the few limited exceptions to the at-will doctrine, she has failed to state a plausible breach of contract claim. *See, e.g., Bergeson,* 783 F.Supp. at 717–18; *Carroll,* 294 F.3d at 242 (affirming dismissal of an at-will employee's breach of contract claim "based upon demotion or reduced compensation"). Savers' motion to dismiss as to Count III is therefore GRANTED.[2]

### C. Count II: Violation of Mass. Gen. L. c. 151B

Count II alleges handicap discrimination under Mass. Gen. L. c. 151B. "Chapter 151B is considered the 'Massachusetts analogue' to the federal Americans with Disabilities Act ('ADA')." *Sensing v. Outback Steakhouse of Fla., LLC,* 575 F.3d 145, 153 (1st Cir.2009) (internal quotation marks and citation omitted). "Claims of handicap discrimination, including a perception of ('regarded as') impairment, proceed under the well-settled three-stage order of proof." *City of New Bedford v. MCAD,* 440 Mass. 450, 461, 799 N.E.2d 578 (2003). To establish a prima facie case of unlawful employment discrimination on the basis of a handicap, a plaintiff must demonstrate that she was: "(1) handicapped; (2) capable of performing the essential functions of the job with reasonable accommodation; and (3) subject to an adverse action by his employer; and (4) the position he had occupied remained open and the employer sought to fill it." *Id.* at 461–62, 799 N.E.2d 578 (quoting Mass. Gen. L. c. 151B. § 4(16)) (internal quotation marks omitted).[3]

Massachusetts courts employ a three-step analysis to determine whether a plaintiff has demonstrated that she is "regarded as" handicapped within the meaning of c. 151 B: (1) whether the plaintiff's condition, actual or perceived, constitutes a mental or physical impairment; (2) whether the life activity curtailed constitutes a major life activity; and (3) whether the impairment substantially limited the major life activity. *Id.* at 463, 799 N.E.2d 578 (citing cases); *see Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (noting that "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities"). It is insufficient for a plaintiff claiming c. 151 B protection "to merely submit evidence of a medical diagnosis of an impairment" to establish that she is

handicapped within the meaning of the statute; rather, a plaintiff must offer evidence that "the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial." *Id.* at 463 (quoting *Carroll,* 294 F.3d at 238) (further citation omitted).

Here, the complaint alleges that Merricks was "regarded as" being "handicapped" due to a "sever[e] sinus infection and mononucleosis." Compl. ¶¶ 37, 39, 44, 47, 48. The ADA, 42 U.S .C . § 12101 et seq., provides that an employee is "regarded as" disabled if she is subject to a prohibited action based on an impairment that is not "transitory or minor." A "transitory impairment" is defined as "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Even assuming, without deciding, that a sinus infection could be considered more than the type of "transitory or minor" impairment not protected under c. 151 B, *see Hallgren v. Integrated Fin. Corp. .,* 42 Mass.App.Ct. 686, 688, 679 N.E.2d 259 (1997), the complaint fails to adequately allege that Savers perceived her to be substantially limited in the major life activity of working due to her alleged handicap.

**\*8** Under Mass. Gen. L. c. 151B, § 1(20), "major life activities" include "working." An impairment substantially limits an individual's ability to work only "if it prevents or significantly restricts the individual from performing a class of jobs or a broad range of jobs in various classes." *New Bedford,* 440 Mass. at 464–65, 799 N.E.2d 578 (quoting MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § II.A.6 (1998)). The complaint alleges that Merricks took a short leave (approximately eight days) to recover from a sinus infection and mononucleosis, (Compl.¶¶ 10–16), and appears to base her claim that Savers regarded her as handicap on the allegation that Savers waited until April 25 to schedule her return to work, rather than scheduling her return for April 23. (Compl.¶¶ 44–45, 48). However,

it would be unreasonable to infer that Savers regarded Merricks as substantially limited in the major life activity of working simply because Savers scheduled her return to work two days after Merricks alleges she could have returned in light of the complaint's allegations that when Merricks returned on April 25, she resumed her normal duties as an AOS and "worked a full schedule until May 5, 2009." Compl. ¶ 16. Merricks missed only eight days of work due to her sinus infection and does not allege any difficulties while performing her job at Savers after she returned to work and resumed her full work schedule. The complaint fails to allege any other facts supporting Merricks' conclusory allegation that her supervisors or anyone at Savers regarded her as substantially limited in her ability to perform a broad range or class of jobs or her ability to perform her job as an AOS. Because Merricks has failed to allege that she was regarded as handicapped within the meaning of c. 151B, she cannot state a plausible claim of handicap discrimination under c. 151B. Savers' motion to dismiss Count II is therefore GRANTED.

## VI. Conclusion

For the foregoing reasons, Savers' motion to dismiss is GRANTED as to Counts II and III and DENIED as to Count I.

**So ordered.**

## All Citations

Not Reported in F.Supp.2d, 2012 WL 32579

Footnotes

1    For the purposes of this Memorandum and Order, the parties' filings are abbreviated as follows: Merricks' verified complaint ("Compl."); Savers' memorandum of law in support of its motion to dismiss ("Def.Memo"); Merricks' opposition to Savers' motion to dismiss ("Pl.Opp."); docket ("D."); and transcript of the October 5, 2011 hearing ("Tr.").

2    The dismissal of Count III (breach of contract) but the survival of Count I (promissory estoppel), however, does not answer the question of the appropriate measure of recovery if Merricks prevails. "[W]hen a promise is enforceable due to reliance [as alleged in Count I], the promise becomes a contract enforceable pursuant to traditional contract theory, ... except as to recovery.... Thus, while the plaintiff may be entitled to a range of damages from full contract damages to reliance or restitution damages, ... the recovery appropriately may be limited as justice requires." *Masso,* 884 F.Supp. at 619 (internal quotation marks and citations omitted).

3    Mass. Gen. L. c. 151B, § 4(16), provides that it is unlawful for an employer "to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified

**Merricks v. Savers, Inc., Not Reported in F.Supp.2d (2012)**

handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation."

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

2019 WL 1936735
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Elmer E. CROSS
v.
Commonwealth of MASSACHUSETTS, et al.

CIVIL ACTION NO. 18-11765-RGS
|
Filed 05/01/2019

**Attorneys and Law Firms**

Elmer E. Cross, Boston, MA, pro se.

Dennis N. D'Angelo, Attorney General's Office, Boston, MA, for Commonwealth of Massachusetts, Executive Office of Labor and Workforce Development, Division of Unemployment Assistance.

Lawrence D. Humphrey, National Association of Government Employees, Quincy, MA, for NAGE.

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

Richard G. Stearns, UNITED STATES DISTRICT JUDGE

**\*1** Elmer Cross, proceeding *pro se*, brought this lawsuit against his former employer – the Commonwealth of Massachusetts and two of its agencies, the Executive Office of Labor and Workplace Development (EOLWD)[1] and the Department of Unemployment Assistance (collectively the Commonwealth) – and his quondam union, the National Association of Government Employees (NAGE) Unit One, Local R1-292, and its President, John Mann. Cross alleges that defendants discriminated against him based on his disability and retaliated against him in violation of the Americans with Disabilities Act of 1990 (ADA), Title I of the Civil Rights Act of 1991, Section 504 of the Rehabilitation Act of 1973, Mass. Gen. Laws ch. 151B, § 4, and Massachusetts Executive Order No. 478.[2] Cross further alleges that NAGE and Mann breached the duty of fair representation by not "vigorous[ly]" representing him in two grievances and by doing "nothing" on his behalf against his employer's purported breaches of a collective bargaining agreement. Second Am. Compl. (Dkt # 34) ¶ 14. The Commonwealth and NAGE, separately, now move to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim.[3] For the reasons to be explained, defendants' motions to dismiss will be allowed.

**BACKGROUND**

The facts, viewed in the light most favorable to Cross as the nonmoving party, are as follows. In 2009, Cross was employed by the Commonwealth as a Job Specialist III. On September 4, 2009, he requested an accommodation for anxiety. On August 25, 2010, he received a partial accommodation. After his health worsened to include symptoms of diabetes and arthritis, he took medical leave from April 1, 2011 until May of 2014.[4] During this extended absence, Cross obtained five "Fitness for Duty Certificates" from his psychiatrist, Dr. Russell Vasile, which his employer purportedly ignored. *Id.* ¶ 11.[5]

**\*2** On May 18, 2014, Cross returned to work as a Mail Clerk. In June of 2014, he contacted the President of NAGE, John Mann, to file a Step II grievance for reinstatement as a Job Specialist III. On January 26, 2015, he was transferred to the Department of Unemployment Assistance. At his performance review on August 6, 2015, a supervisor, Theresa DeMarco, stated that he met expectations. But later that day, he got into an argument with another supervisor, Luz Cepeda-Gonzales, over her criticisms of his work. As a result, Cross was immediately placed on "Involuntary Administrative Medical Leave of Absen[ce]." *Id.* ¶ 13. However, he was allowed to return to work after obtaining a "Fit for Duty Certification" from a doctor, which he submitted on September 19, 2015. *Id.* On February 18, 2016, he was placed back on the payroll, but was prohibited from working. On May 31, 2016, Cross was terminated allegedly for budgetary reasons.

On May 13, 2016, Cross filed a charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC). *See* Dkt # 10-1.[6] He alleged that the EOLWD retaliated against him for pursuing a disability discrimination claim with the EEOC.

After the MCAD found a lack of probable cause on April 6, 2018, Cross initiated this lawsuit on August 17, 2018.[7] He contends that defendants engaged in disability discrimination and retaliation, and that NAGE and Mann breached the duty of fair representation.

## DISCUSSION

Defendants move to dismiss this action for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Cross, therefore, bears the burden of proving that the court has jurisdiction. *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). To determine if Cross has met his burden, the court "glean[s] the relevant background information from the plaintiff['s] [second] amended complaint, accepting the well-pleaded factual averments contained therein and indulging all reasonable inferences in the plaintiff['s] favor." *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003).

Defendants also move to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013), quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

### ADA and Mass. Gen. Laws ch. 151B
Cross alleges that defendants discriminated against him based on his disability and then retaliated against him in violation of the ADA and Chapter 151B. However, these claims against the Commonwealth and NAGE both fail, but for different jurisdictional reasons.

**\*3** The claims against the Commonwealth must be dismissed because of sovereign immunity. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law

or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Am. XI. "The Supreme Court ... has expanded the doctrine of sovereign immunity beyond the literal words of the Eleventh Amendment, holding that state governments, absent their consent, are not only immune from suit by citizens of another state, but by their own citizens as well." *Guillemard Ginorio v. Contreras Gomez*, 585 F.3d 508, 529 n.23 (1st Cir. 2009), citing *Alden v. Maine*, 527 U.S. 706, 728-729 (1999). The Supreme Court has also specifically held that "Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I" of the ADA. *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 n.9 (2001).[8] The Commonwealth and two of its agencies are therefore immune from suit under the ADA and Chapter 151B because they neither consented to this action nor waived sovereign immunity. *See Murphy v. Massachusetts - Exec. Office of Trial Court*, 335 F. Supp. 3d 137, 144-145 (D. Mass. 2018) (dismissing plaintiff's ADA and Chapter 151B claims against the Commonwealth because of sovereign immunity).

The claims against NAGE and Mann must be dismissed because Cross failed to exhaust his administrative remedies.[9] Claims under the ADA and Chapter 151B must be administratively pursued with the MCAD or the EEOC before filing a lawsuit. *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir. 1999); *Everett v. 357 Corp.*, 453 Mass. 585, 599-600 (2009). The administrative filing requirement serves the dual purpose of providing a defendant with notice and of giving the agency an opportunity to investigate and conciliate the claim. *Id.* at 600; *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996). Although Cross filed an MCAD charge against the EOLWD, he did not name NAGE or Mann as defendants.[10] *See* Dkt # 10-1. The discrimination claims against them therefore fail as a matter of law.[11]

### Title I of the Civil Rights Act
**\*4** Cross also alleges that defendants violated Title I of the Civil Rights Act. However, the Act does not create an independent cause of action, but rather provides "a major expansion in the *relief* available to victims of employment discrimination." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 255 (1994) (emphasis added). In other words, it "merely expands the *remedies* available under substantive acts and should only be regarded as an extension of and amendment thereto." *Presutti v. Felton Brush, Inc.*, 927 F. Supp. 545, 550 (D.N.H. 1995) (emphasis added). Thus,

having already dismissed the ADA claim, the court must also dismiss the Civil Rights Act claim. *See Rivera Concepcion v. Puerto Rico*, 682 F. Supp. 2d 164, 172 (D.P.R. 2010) ("Plaintiffs ... misunderstand basic applications of the law, trying to raise a 'claim' pursuant to a section of a statute pertaining exclusively to remedies.").

### Section 504 of the Rehabilitation Act
Cross further alleges that defendants violated Section 504 of the Rehabilitation Act. To state such a claim, Cross "must show that [ ]he is disabled; (2) that [ ]he sought services from a federally funded entity; (3) that [ ]he was 'otherwise qualified' to receive those services; and (4) that [ ]he was denied those services 'solely by reason of [his] ... disability.' " *Lesley v. Hee Man Chie*, 250 F.3d 47, 53 (1st Cir. 2001), quoting 29 U.S.C. § 794(a).

Here, Cross does not allege that either NAGE or Mann are "federal agencies, contractors [or] recipients of federal financial assistance." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).[12] Nor has Cross alleged that the Commonwealth and two of its agencies are federally funded. *Jenkins v. Bos. Hous. Court*, 350 F. Supp. 3d 1, 6 (D. Mass. 2018) ("Absent any allegation that defendant BHC is the recipient of federal funding, plaintiff has failed to allege an element of a § 504 claim[.]"). Cross, therefore, fails to state a valid Rehabilitation Act claim against defendants.

### Massachusetts Executive Order No. 478
Cross additionally alleges that defendants violated Executive Order No. 478. Implemented on January 30, 2007, the Order provides that "[n]on-discrimination, diversity, and equal opportunity shall be the policy of the Executive Branch of the Commonwealth of Massachusetts in all aspects of state employment, programs, services, activities, and decisions."

Cross's claim, however, fails for several reasons. First, the Order did not create a private right of action. Second, the Order was superseded on February 7, 2011 by **Executive Order 526**, and is therefore no longer in effect. Third, the Order did not even apply to NAGE or Mann because they are not "state agencies in the Executive Branch."

### Duty of Fair Representation
Cross alleges, in effect, that NAGE and Mann breached the duty of fair representation because they (1) were "negligent" in not "vigorous[ly] defend[ing]" him in two grievances and (2) "did nothing" on his behalf to challenge his employer's breaches of the collective bargaining agreement. Second Am. Compl. (Dkt # 34) ¶ 14. "A union has a duty to represent its members fairly in connection with issues that arise under a collective bargaining unit." *Nat'l Ass'n of Gov't Employees v. Labor Relations Comm'n*, 38 Mass. App. Ct. 611, 613 (1995). A union breaches that duty "if its actions toward an employee are 'arbitrary, discriminatory, or in bad faith.' " *Cappellano v. Massachusetts Bay Transp. Auth.*, 38 Mass. App. Ct. 231, 234 (1995), quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).

**\*5** Cross has not plausibly pled that NAGE breached the duty of fair representation. The first allegation of negligence for not adequately representing him is insufficient. *See Goncalves v. Labor Relations Comm'n*, 43 Mass. App. Ct. 289, 294 (1997) ("[O]rdinary negligence may not amount to a denial of fair representation[.]") (citation omitted).[13] The second allegation of failing to contest his employer's breaches similarly falls short, especially given NAGE's "considerable discretion not to pursue a grievance." *Graham v. Quincy Food Serv. Employees Ass'n*, 407 Mass. 601, 606 (1990). Cross does not specifically allege that NAGE's inaction was "improperly motivated, arbitrary, perfunctory or demonstrative of inexcusable neglect." *Id.* (citations omitted).

Nor has Cross stated a valid claim against Mann. As the President of NAGE, Mann is immune from personal liability for union activities conducted within the collective bargaining process. *See Montplaisir v. Leighton*, 875 F.2d 1, 4 (1st Cir. 1989) ("With monotonous regularity, court after court has ... foreclose[d] state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process."); *Best v. Rome*, 858 F. Supp. 271, 276 (D. Mass. 1994), *aff'd*, 47 F.3d 1156 (1st Cir. 1995) ("[T]o the extent that defendants acted on behalf of the union during the collective bargaining process, they are immune from liability.").

## ORDER

For the foregoing reasons, defendants' motions to dismiss are <u>ALLOWED</u> with prejudice.[14] The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 1936735

Footnotes

1       Although the Second Amended Complaint also names the Office of Diversity and Equal Opportunity, the court does not treat it as an additional defendant because it is not a separate agency but rather an office within the EOLWD, and Cross has not served it. *See* MA Mem. (Dkt # 41) at 1 n.1.

2       The court discerns these causes of action from the Second Amended Complaint, which is, at times, opaque.

3       In the alternative, the Commonwealth moves for a more definite statement. The Commonwealth and NAGE further move to dismiss the Second Amended Complaint for insufficient service of process. On October 10, 2018, the court ordered that Cross complete service within 90 days (i.e., by January 8, 2019) or his case would "likely be dismissed." Dkt # 12 ¶ 3. Although the Commonwealth and NAGE were served on January 15 and 18, respectively, the court does not dismiss the Second Amended Complaint on that ground.
        While Cross has not opposed either NAGE's or the Commonwealth's motions to dismiss, the court proceeds to analyze the merits of the Second Amended Complaint. *See Pomerleau v. W. Springfield Pub. Sch.*, 362 F.3d 143, 145 (1st Cir. 2004) ("When deciding a 12(b)(6) motion, 'the mere fact that a motion to dismiss is unopposed does not relieve the district court of the obligation to examine the complaint itself to see whether it is formally sufficient to state a claim.' "), quoting *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003).

4       Cross later identifies his disability as "Anxiety, Atypical Depression, Osteoarthritis, [and] Type II Diabetes." Second Am. Compl. (Dkt # 34) ¶ 14.

5       Cross alleges that he sought to return to work after March 1, 2012, but his employer did not allow him to do so.

6       The court may consider the MCAD Charge and EEOC Notice of Suit Rights, along with the collective bargaining agreement, because they are referenced in the Second Amended Complaint. *See Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014) ("On a motion to dismiss, ... a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.' ") (citations omitted and alteration in original).

7       NAGE argues that Cross did not initiate this lawsuit against it until September 8, 2018, more than 90 days after the EEOC issued the Notice of Suit Rights. However, Cross's original complaint, which named NAGE as a defendant, was filed on August 17, 2018. *See also* Fed. R. Civ. P. 15(c)(3).

8       Although Cross also seeks injunctive relief, his claim is still barred. *See Irizarry-Mora v. Univ. of Puerto Rico*, 647 F.3d 9, 11 n.1 (1st Cir. 2011) ("In the absence of consent, waiver, or abrogation, the Eleventh Amendment bars suit against states themselves regardless of the form of relief sought.").

9       The ADA claim against Mann fails for the additional reason that individuals are not liable under the ADA. *See Fink v. Printed Circuit Corp.*, 204 F. Supp. 2d 119, 129 (D. Mass. 2002) (dismissing the ADA claims against the individual defendants because the ADA's "definition of employer extends to agents so as 'to ensure employer liability, and reject individual liability' ") (citation omitted); *Orell v. UMass Mem'l Med. Ctr., Inc.*, 203 F. Supp. 2d 52, 64 (D. Mass. 2002) ("Although the First Circuit Court of Appeals has declined to determine whether individuals can be held liable under the federal anti-discrimination statutes, almost all circuits that have addressed the issue have determined that individual liability is not authorized. Most district courts in this circuit have also determined that the statutes do not invoke individual liability.") (citations omitted).

10      Cross blames the MCAD investigator for failing to name NAGE, but it was his responsibility to do so. Pl.'s Opp'n (Dkt # 30) at 2.

11       The court recognizes that a plaintiff need not always name a party in an EEOC proceeding to bring a civil action under the ADA, *see McKinnon v. Kwong Wah Rest.*, 83 F.3d 498, 505 (1st Cir. 1996) ("Although generally a plaintiff must name a defendant in the proceedings before the EEOC in order to proceed against that defendant in federal court under Title VII, this charging requirement is subject to exceptions."), but concludes that none of the exceptions apply here, *see id.* (finding that the charging requirement is not jurisdictional if there is a "substantial identity" between the EEOC respondent and the defendants in a civil action or if a court finds waiver, estoppel, or equitable tolling).

12       The claim against Mann fails for the additional reason that individuals are not liable under the Rehabilitation Act. *See Mitchell v. Massachusetts Dep't of Correction*, 190 F. Supp. 2d 204, 213 (D. Mass. 2002) ("While '[t]he First Circuit Court of Appeals and the Supreme Court have yet to decide th[e] issue of individual liability[,] ... the majority of circuits that have confronted this issue [have held] that no personal liability can attach to agents and supervisors under ... the Rehabilitation Act.' "), quoting *Castro Ortiz v. Fajardo*, 133 F. Supp. 2d 143, 150-151 (D.P.R. 2001).

13       Also, as NAGE notes, the two grievances remain pending. NAGE Mem. (Dkt # 38) at 13.

14       Having so concluded, the court need not reach the Commonwealth's alternative motion for a more definite statement.

---

**End of Document**                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---